1   Allen Lichtenstein
    General Counsel, ACLU of Nevada
2   NV Bar No. 3992
    3315 Russell Road, No. 222
3   Las Vegas, Nevada 89120
    702-433-2666 - phone
4   702-433-9591 - fax
    alichtensteinlaw@aol.com
5
    Lee Rowland
6   Staff Attorney, ACLU of Nevada
    NV Bar No. 10209
7   732 South Sixth Street, Suite 200A
    Las Vegas, NV 89101
8   702-366-1902 - phone
    702-366-1331 - fax
9   rowland@aclunv.org

10  Attorneys for Plaintiffs

                    UNITED STATES DISTRICT COURT
11                       DISTRICT OF NEVADA

12  GAIL SACCO, LYLA BARTHOLOMAE, JOE SACCO, JOHN       )
    BROWN, CODY HUFF, PATRICK BAND, ROBERT              )
13  EDMONDS, INDIVIDUALS;  SOUTHERN NEVADA              )
    ADVOCATES FOR HOMELESS PEOPLE, LAS VEGAS FOOD       )
14  NOT BOMBS; LAS VEGAS CATHOLIC WORKER,               )
    AMERICAN CIVIL LIBERTIES UNION OF                   )
15  NEVADA; GARY PECK;                                  )
                              Plaintiffs                )
16  v.                                                  )   06-CV-714-RCJ-LRL
                                                        )   06-CV-941-RCJ-LRL
17   CITY OF LAS VEGAS, NEVADA; LOIS TARKANIAN,         )
    STEVEN WOLFSON, GARY REESE, STEVEN ROSS,            )
18  LAWRENCE WEEKLY, LARRY BROWN, CITY COUNCIL          )
    MEMBERS; OSCAR GOODMAN, MAYOR; DOUGLAS SELBY        )
19  CITY MANAGER; LAS VEGAS DEPARTMENT OF LEISURE       )   **MOTION**
    SERVICES; LAS VEGAS METROPOLITAN POLICE             )   **FOR SUMMARY**
20  DEPARTMENT, LAS VEGAS DEPUTY CITY MARSHALS,         )   **JUDGMENT**
                                                        )
21                            Defendants.               )
    ────────────────────────────────────────────────── )

22
            Come now the Plaintiffs and file this Motion for Summary Judgment, requesting this Court to declare
23
    Las Vegas Municipal Code Sections 13.36.055 ("No Feeding the Indigent"); 13.36.080, 13.36.090, 13.36.132,
24
    13.36.134, 13.36.136, 13.36.138, 13.36.190 ("Permit Code");  Las Vegas Municipal Code Sections 13.36.060,
25
    13.36.070, 13.36.160 ("Children's Only Parks"); and the policy and practice of Trespassing (or "86"ing),
26
    unconstitutionally vague and overbroad, and in violation of the First, Fifth, and Fourteenth Amendments to the
27
    U.S. Constitution, and Article 1, Section 9 of the Nevada Constitution, both facially and as applied by the
28
    Defendants.  Plaintiffs also request that this Court enjoin the operation of these ordinances by Defendants, and

1 award such damages to Plaintiffs as this Court finds appropriate.  This motion is made based on all pleadings

2 and papers on file in this case, oral arguments during the hearing for a Preliminary Injunction against LVMC

3 13.36.055, the Memorandum of Points and Authorities attached hereto and any further argument and evidence

4 as may be presented at hearing.

5 　　　　Dated this 11th  day of April 2007:

6 　　　　Respectfully submitted by:

7

8 　　　　/s/　　　　　　　　　　　　　　　　　　/s/

9 Allen Lichtenstein　　　　　　　　　　　Lee Rowland
General Counsel,　　　　　　　　　　　　Staff Attorney, ACLU of Nevada
10 ACLU of Nevada NV　　　　　　　　　　NV Bar No. 10209
Bar No. 3992　　　　　　　　　　　　　　732 South Sixth Street, Suite 200A
11 3315 Russell Road, No. 222　　　　　　　Las Vegas, NV 89101
Las Vegas, Nevada 89120　　　　　　　　702-366-1902 -phone
12 702-433-2666 - phone　　　　　　　　　702-366-1331-fax
702-433-9591 - fax　　　　　　　　　　　 rowland@aclunv.org
13 alichtensteinlaw@aol.com

14 　　　　　　　　　　　　　　　　　　　Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Memorandum of Points and Authorities 1

I.      Introduction 1

II.     Standards for Summary Judgment 1

III.    Parties 2

IV.     Procedural History 2

V.      Facts 3

VI.     Standing 5

    A.      Plaintiffs Have Standing to Pursue a Facial Challenge to the Permit Code, Trespass Policy, and Children's-Only Parks 5

VII.    Argument 6

    A.      This Court Should Reaffirm its Finding That LVMC 13.36.055 is Unconstitutionally Vague and Violates the Fifth Amendment's Guarantee of Equal Protection 8

    B.      The Las Vegas Public Park Permitting Code is an Unconstitutional Infringement on the Rights to Free Speech and Assembly 8

        1.      Restrictions on First Amendment Activities in a Public Forum are Subject to Strict Scrutiny and Must be Narrowly Tailored 8

        2.      The Las Vegas City Park Permit Code is Impermissibly Content-Based 9

        3.      The Las Vegas City Permit Code is Not Narrowly Tailored, and Does Not Leave Open Adequate Alternative Channels of Communication 10

        4.      The Vague Standards of the Permit Code Fail to Provide Adequate Notice and Encourage Discriminatory Enforcement 12

        5.      The Permit Code Violates Equal Protection as Applied to Plaintiffs 16

        6.      The 14-Day Advance Permit Requirement Creates an Impermissible Chill on Protected Speech 17

        7.      The Insurance Provisions of the Permit Policy for "Special Events" Violate the First Amendment 18

    C.      Children's Only Parks Restrict Speech in a Quintessential Public Forum 19

    D.      The Las Vegas Trespass Policy is an Unconstitutional Deprivation of the Rights to Due Process and Freedom of Movement, and is Impermissibly Vague 21

1.    This Policy Impinges on the Fundamental Right of Free          22
      Movement and Should Receive Strict Scrutiny

2.    The City's Trespass Policy Completely Denies Due Process       22
      to Those Trespassed

3.    The City's Trespass Policy is Impermissibly Vague              25

VIII.  Conclusion                                                    28

1

# TABLE OF CASES CITED

2    Adickes v. S.H. Kress and Co., 398 U.S. 144 (1970)      2

3    Admiralty Fund v. Hugh Johnson & Co., 677 F.2d 1301 (9th Cir. 1982)      1

4    Admiralty Fund v. Jones, 677 F.2d 1289 (9th Cir. 1982)      1

5    American Civil Liberties Union  of Nevada v. City of Las Vegas, 466 F.3d 784      2,12,17
     (9th Cir. 2006)

6

   Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)      1

7

   Aptheker v. Secretary of State, 378 U.S. 500 (1964)      6

8

   Carey v. Brown, 447 U.S. 455  (1980)      17

9

   City of Chicago v. Morales, 527 U.S. 41 (1999)      6,22,23,25

10                                                                         27,28

11    Clark v. Community for Creative Nonviolence, 468 U.S. 288 (1984)      11

12    Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)      24

13    Coates v. City of Cincinnati, 402 U.S. 611 (1971)      24,26,28

14    Collins v. Jordan, 110 F.3d 1363 (9th Cir.1996)      8,19

15    Forsyth County v. The Nationalist Movement, 505 U.S. 123 (1992)      6,10,16,18

16                                                                         19

   Foti v. City of Menlo Park, 146 F.3d 629 (9th Cir.1998)      8,20

17

   Freedman v. Maryland, 380 U.S. 51 (1965)      7

18

   Friends of Earth v. Laidlaw Environmental Services, 528 U.S. 167 (2000)      5

19

   Galvin v. Hay, 374 F.3d 739 (9th Cir. 2004)      9,12

20

   Gerritsen v. City of Los Angeles, 994 F.2d 570 (9th Cir.1993)      12

21

   Grossman v. City of Portland, 33 F.3d 1200 (9th Cir.1994)      9,17,18

22

   Ingram v. Wright, 430 U.S. 65 (1977)      23

23

   International Society for Krishna Consciousness, 452 U.S. 640 (1981)      9

24

   Kent v. Dulles, 357 U.S. 116 (1958)      22

25

   Kolender v. Lawson, 461 U.S.352 (1983)      22,23,25,

26                                                                         27,28

27

28

LSO, Ltd. v. Stroh, 205 F.3d 1146 (9th Cir. 2000)     5,6

Mardi Gras of San Luis Obispo. v. City of San Luis Obispo, 189 F. Supp. 2d 1018 (C.D. Cal. 2002)     8,9,10,17 20

Margolis v. Ryan, 140 F.3d 850 (9th Cir. 1998)     1

Mathews v. Eldridge, 424 U.S. 319 (1976)     23

NAACP v. City of Richmond, 743 F.2d 1346 (9th Cir.1984)     17

Nunez v. City of San Diego, 114 F. 3d 935 (9th Cir. 1997)     6,22,23

Olsen v. Idaho State Bd. of Med., 363 F.3d 916 (9th Cir.2004)     1

One World One Family Now v. City and Cty of Honolulu, 76 F.3d 1009 (9th Cir.1996)     12

Papachristou v.  City of Jacksonville, 405 U.S. 156 (1972)     26,27,28

Pegasus Fund, Inc. v. Laraneta, 617 F.2d 1335 (9th Cir. 1980)     1

Roley v. Pierce Co. Fire Prot. Dist. No. 4, 869 F.2d 491 (9th Cir. 1989)     23

Rosen v. Port of Portland, 641 F.2d 1243 (9th Cir.1981)     17,18

Santosky v. Kramer, 455 U.S. 745 (1982)     23

S.E.C. v. Seaboard Corp., 677 F.2d 1301 (9th Cir. 1982)     1

S.O.C., Inc. v. County of Clark, 152 F.3d 1136(9th Cir.1998)     9,10,11

Shuttlesworth v. City of Birmingham, 394 U.S. 147 (1969)     6,8,15,19 27,28

Smith v. Goguen, 415 U.S. 566 (1974)     27

Tie Tech, Inc. v. Kinedyne Corp., 296 F.3d 778 (9th Cir.2002)     1

Thomas v. Chicago Park Dist., 534 U.S. 316 (2002)     6,7,13,14 15,16,18

United States v. First National Bank, 652 F.2d 882 (9th Cir. 1981)     1

United States v. Grace, 461 U.S. 171 (1983)     5,7,19

United States v. Kokinda, 497 U.S. 720 (1990)     11

United States v. Reese, 92 U.S. 214 (1875)     26,27

United States v. Schneider, 308 U.S. 147 (1939)     19

United States v. Wheeler, 254 U.S. 281 (1920)     22,23

Ward v. Rock Against Racism, 491 U.S. 781 (1989)                                    9,18

Williams v. Fears, 179 U.S. 270 (1900)                                              22,23

Zoslaw v. MCA Distr. Corp., 693 F.2d 870 (9th Cir. 1982)                            2

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF A MOTION FOR SUMMARY JUDGMENT**

## I.  Introduction

Plaintiffs initially brought this action for declaratory, injunctive, and monetary relief pursuant to 28 USC 2201 and 42 USC 1983, requesting that this Honorable Court declare Las Vegas Municipal Code (LVMC) Sections 13.36.080, 13.36.090, 13.36.132, 13.36.134, 13.36.136, 13.36.138, 13.36.190 ("Park Reservation System");  Las Vegas Municipal Code Sections 13.36.060, 13.36.070, 13.36.160 ("Children's Only Parks");and the policy and practice of Trespassing (or "86"ing), in violation of the First and Fourteenth Amendments to the U.S. Constitution, and Article 1, Section 9 of the Nevada Constitution, and that it enjoin their enforcement by the Defendants. Plaintiffs later filed suit against Las Vegas Municipal Code 13.36.055 (No Feeding the Indigent); and requested a Preliminary Injunction against LVMC 13.36.055, which was granted by this Court in a written opinion in January, 2007.  These two suits were consolidated by this Court.  Pursuant to FRCP 56, Plaintiffs now move for a declaration that all of these ordinances, provisions and policies are unconstitutional and for an injunction permanently enjoining their enforcement.

## II.  Standards for Summary Judgment

Pursuant to  F.R.C.P.  56, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See, Olsen v. Idaho State Bd. of Med.,* 363 F.3d 916, 922 (9th Cir.2004;) *Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1305-06 (9th Cir. 1982); *Pegasus Fund, Inc. v. Laraneta*, 617 F.2d 1335, 1339 (9th Cir. 1980); *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998).  A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 784-785 (9th Cir.2002); *Admiralty Fund v. Jones*, 677 F.2d 1289, 1293 (9th Cir. 1982);*United States v. First National Bank*, 652 F.2d 882, 887 (9th Cir. 1981);  *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).  Once the moving party presents evidence that would call for judgment as a matter of law at trial if left uncontroverted, the respondent must show by specific facts the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). Summary judgment may be appropriate when the movant is entitled to a judgment as a matter of law, even if the court accepts as true all evidence favorable to the party against

1

whom the motion for summary judgment is made. *American Civil Liberties Union of Nevada v. City of Las Vegas*, 466 F.3d 784, 790 (9th Cir. 2006).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.C.P. 56( C). The burden of demonstrating the absence of a genuine issue of material fact lies with the moving party. *See, Zoslaw v. MCA Distr. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). For the purpose of summary judgment, the material lodged by the moving party must be viewed in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157 (1970).

**III.    Parties**

As more fully set forth in the Complaints, which are hereby incorporated by reference, Plaintiffs are individuals and groups that contain individuals who are religious and political activists involved with issues regarding the problems of the homeless, and whose expressive activities, to this end, involve public political actions in Las Vegas City Parks, including: demonstrations, leafleting, speech and activities such as providing food. Defendants are entities, officials and agents of the City of Las Vegas, who are involved with the creation and enforcement of said ordinances and practices.

**IV.    Procedural History**

Plaintiffs Gail Sacco and Bartholomae were given misdemeanor citations on February 19, 2006, under Las Vegas Municipal Code Section 13.36.080, and John Brown on May 22. Their offense was listed as having "25 or more people participate or witness such event without obtaining a permit." *See* Citations, Exhibit 1, at 1-2. In addition to receiving misdemeanor tickets, both Sacco and Bartholomae were also verbally Trespassed, or "86"ed, from Circle Park, for six months. This "86"ing consisted of the Marshals writing their two names into a notebook, with identifying information. The Marshals informed both Ms. Sacco and Ms. Bartholomae that they were "86"ed, meaning that if they stepped on Circle Park's property in the next six months, they would be arrested and cited for trespassing.

In early March 2006, Ed Poleski of the Las Vegas City Attorney's office personally informed ACLU of Nevada General Counsel Allen Lichtenstein that the "86" Order had been rescinded for both Ms. Sacco and Ms. Bartholomae. On March 20, 2006, Ms. Sacco and Ms. Bartholomae attended a scheduled hearing on their

misdemeanor complaints under Las Vegas Code section 13.36.080, represented by ACLU of Nevada General Counsel Allen Lichtenstein. The proceedings in the state district court were stayed pending this federal court filing, with the agreement of both parties. On May 22, 2006, John Brown was cited for feeding the homeless at Circle Park without a permit.

On August 1, 2006, Plaintiffs filed suit against the enforcement of LVMC 13.36.055. This Court ordered consolidation of the ACLU of Nevada's two suits involving use of the public parks of Las Vegas. Cases 06-CV-714-RCJ-LRL and 06-CV-941-RCJ-LRL were consolidated into the instant case.

On August 10, 2006, Plaintiffs Edmonds and Band were ticketed for violating LVMC 13.36.055. Plaintiffs moved to add the two men as Plaintiffs in an Amended Complaint, and criminal hearings on Mr. Edmonds' misdemeanor charge have been stayed in state court by the consent of both parties. By contrast, Las Vegas Muncipal Court Judge George Assad found Mr. Band's criminal charge to be based on a facially invalid law, and threw out the criminal charge with no written finding on 13.36.055. *See* Transcript of Hearing Before Judge Assad, Exhibit 2. Plaintiffs then filed for a Preliminary Injunction against enforcement of LVMC 13.36.055. This Court granted the Amended Complaint including Plaintiffs Band and Edmonds, and held oral argument on the Preliminary Injunction. On January 26, 2007, this Court entered a written Preliminary Injunction, finding LVMC 13.36.055 unconstitutionally vague and violative of Equal Protection.

On October 13, 2006, plaintiff Gail Sacco was cited under 13.36.055(6) for giving "food or meals to one or more indigent people without a permit" [sic]. Las Vegas Citation # 03800379; Event # 20061013-0047. At the time of her citation, Ms. Sacco was asked if she had ever been cited for "this law" before, and when she asked "you mean for feeding the indigent?" the ticketing Marshal officer asked Ms. Sacco how she knew the people she was with were indigent. Ms. Sacco replied, "I don't." Nonetheless, the Marshal cited her, apparently determining based on aesthetic appearance that the individuals Ms. Sacco was sharing food with were "indigent."

**V.     Facts**

The Las Vegas Municipal Park Reservation System [hereinafter Permit Code] consists of LVMC Sections 13.36.080, 13.36.090, 13.36.100, 13.36.132, 13.36.134, 13.36.136, 13.36.138, and 13.36.190. The full text of all relevant ordinances is attached at Exhibit 3.

The Las Vegas ordinances permitting the designation of, and setting regulations and penalties for,

1  Children's-Only Parks consist of LVMC Sections 13.36.060, 13.36.070, 13.36.160. The full text of all relevant
2  ordinances is attached at Exhibit 3.

3      The Las Vegas Metropolitan Police Department and the Las Vegas Deputy Marshals employ a Trespass
4  system whereby officers may "Trespass" (or "86" ) individuals from a specific area, usually for a period of six
5  months. *See* Marshals Trespass Policy, Exhibit 4, at 3-4. If that individual, after having been "86"ed by law
6  enforcement, returns to the geographic area within the "86" time frame, he or she can then be arrested for
7  Trespass. There is no court oversight or due process involved in this system.

8      On February 19, 2006, Marshals and Metro officers came to Circle Park and ticketed Lyla Bartholomae
9  and Gail Sacco for not having a permit. Although Ms. Sacco and Ms. Bartholomae were at different tables in
10 the park (each with fewer than 25 people), and had arrived in different vehicles with different food to share, the
11 Marshals explained that the City Attorney's office had instructed the officers to ticket them nonetheless. The
12 misdemeanor citation given to both women cited them for having "25 or more people participate or witness such
13 event without obtaining a permit." *See* Citations, Exhibit 1. Huntridge Circle Park is a "non-reservable" park,
14 where permits are not available. On May 22, 2006, John Brown was cited for feeding the homeless at Circle
15 Park without a permit. *Id.*

16     According to materials provided by the Department of Leisure Services, "reservable" is the term used
17 to identify any park subject to permitting under Las Vegas Municipal Code Sections 13.36.080  or Section
18 13.36.134. According to these materials, only 14 of the City of Las Vegas's 65 public parks are available for
19 reservation or permits. *See* Permit Regulations, Exhibit 5, at 5.

20     On  July 19, 2006, the Las Vegas City Council unanimously passed a new misdemeanor offense, Las
21 Vegas Municipal Code ordinance 13.36.055, "Prohibitions." This bill also provided for a $1000 fine for any
22 violation. The full text of LVMC 13.36.055 and related state laws are attached at Exhibit 3. The Las Vegas City
23 Council members announced that the City Marshals would begin immediate enforcement of the ordinance after
24 a training period designed to help Marshals identify  the indigent and decide "how the ordinance would be
25 enforced." Plaintiffs Band and Edmonds were cited for violations of 13.36.055(6) in August of 2006, and
26 Plaintiffs moved to add them as Plaintiffs and seek a preliminary injunction against continued enforcement of
27 LVMC 13.36.055. The preliminary injunction was granted by this Court after briefing and oral argument.

28     Plaintiffs reassert and reincorporate all prior factual and legal statements made in this case in all

pleadings, motions, and oral testimony.

## VI.    Standing

Plaintiffs Gail Sacco, Lyla Bartholomae and John Brown have standing to challenge both the park reservation system and the policy of Trespassing, because they have been arrested and charged for violating Las Vegas City Code 13.36.080, and Plaintiffs Sacco and Bartholomae were simultaneously "Trespassed" from Circle Park.  The City's voluntary dismissal of the Trespass orders does not destroy Plaintiffs' standing, because the City is free to Trespass them at any time for their ongoing activity in the parks.  See, e.g., *Friends of Earth v. Laidlaw Environmental Services,* 528 U.S. 167, 189 (2000) ("a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice").  Plaintiffs Band, Edmonds, and Sacco all have been issued misdemeanor citations for sharing food with indigent persons under LVMC 13.36.055.  Plaintiffs therefore have direct injury and standing to challenge the Park Permit Code, the City Trespass Policy,  and 13.36.055(6).

### A.    Plaintiffs Have Standing to Pursue a Facial Challenge to the Permit Code, Trespass Policy, and Children's-Only Parks

All challenged Park Codes (Permitting, Trespassing, Children's Only Parks, and No Feeding the Indigent),  impinge on the First Amendment rights of all Plaintiffs in the Las Vegas public park system, where all Plaintiffs conduct protected First Amendment activity ranging from protest to leafletting to religious ministry.  *See, i.e. LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000)("when the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing").  The public park is the quintessential public forum, where First Amendment rights have their fullest effect.  *See, i.e., U.S. v. Grace*, 461 U.S. 171, 176 (1983).

Plaintiff Gail Sacco has declared under penalty of perjury (*See* Third Declaration of Gail Sacco, Exhibit 6, at 1) that she and those who help her share food opt not to apply for permits in the few parks where permit applications are allowed, such as Jaycee Park, due to the onerous time and cost requirements.   Plaintiff Las Vegas Catholic Worker desires to utilize the parks for sharing food with the homeless and disseminating its message as it had been doing in the past, especially in Pearson Park, but now avoids ministry in the public parks since Pearson was designated as "Children's-Only" (*See* Verified Complaint).  Plaintiffs Joe Sacco, Gail Sacco, Lyla Bartholomae, John Brown, Food Not Bombs, all gather in public parks as a form of protest and free speech,

as well as charitable outreach.  Plaintiff ACLU of Nevada and their members leaflet, advise, and help organize group protests in all public spaces as a part of their civil rights mission, and would seek to obtain permits for group demonstrations if more public space was available for protest, and if the requirements of the Permit Code were less onerous.  Thus, the Permit Code and Children's-Only Parks directly chill speech and protest by reducing the availability of a public forum.  See *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000)("when the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing").

The Supreme Court has traditionally recognized the validity of facial challenges in cases where, as here, substantive constitutional rights are implicated.  See, e.g., *Aptheker v. Secretary of State*, 378 U.S. 500 (1964)(right to travel); *City of Chicago v. Morales*, 527 U.S. 41 (1999)(liberty and free movement). The Trespass policy impedes the fundamental right of free movement and free speech, fails to give proper notice of the prohibited conduct, fails to adequately guide law enforcement, and fails to provide for due process each and every time it is applied.  See, e.g., *Morales*, 527 U.S. 41, 71 (1999) (Breyer, J., concurring)("[I]f every application of the [statute] represents an exercise of unlimited discretion, then the [statute] is invalid in all its applications.").  *See also Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969), *Forsyth County v. The Nationalist Movement*, 505 U.S. 123 (1992); *Morales*, 527 U.S. 41; *Nunez v. City of San Diego*, 114 F. 3d 935 (9th Cir. 1997)) (all facially invalidating laws on vagueness grounds).

## VII.    Argument

In its January 26,  2007 Order, this Court entered a preliminary injunction preventing enforcement of LVMC  13.36.055(A)(6). That holding was limited to a prohibition, in all City Parks,  of giving food to people who are or are presumed to be indigent. The Court noted the possibility of an ordinance placing some limits on size and frequency of large gatherings in these parks, and also made clear that any such regulations would have to be supported by evidentiary legislative history. *See* Transcript of Oral Argument, Exhibit 12, at 22.

LVMC 13.36.080, 13.36.090, 13.36.132, 13.36.134, 13.36.136, 13.36.138, 13.36.190,  (collectively referred to as the "Permit Code") creates a permit requirement for park gatherings, regardless of purpose. Thus, facially, the Permit Code includes, but does not target, either the homeless or people engaged in First Amendment protected expressive activity. In *Thomas v. Chicago Park Dist*., 534 U.S. 316 (2002), political activists challenged, on First Amendment grounds, an ordinance that required a permit for park events involving

1  more than 50 people. The Court ruled that the ordinance in question, although impacting on First Amendment

2  events, did not have to follow the licensing requirements of *Freedman v. Maryland*, 380 U.S. 51, 85 (1965), but

3  instead would be analyzed as a content-neutral, time, place and manner restriction. 534 U.S. at 322. The *Thomas*

4  Court noted that the Chicago ordinance was saved by the fact that it did not afford the government the discretion

5  to discriminate among speakers or content and was narrowly tailored to not restrict the amount of speech

6  allowed in the parks.  380 U.S. at 323.

7      There are several important distinctions, however, between the Chicago permit scheme in *Thomas*, and

8  the Las Vegas Permit Code, resulting in the latter's containing the very constitutional violations that the

9  Supreme Court stated were absent in the Chicago Park case. The Las Vegas Code is based on governmental

10  discretion as to speech and message. It also targets expression by counting "witnesses" to an event, which

11  includes the audience that is already present at the park. Where a non-expressive event, such as a picnic, is

12  unlikely to draw interest from anyone beyond participants, political demonstrations on a controversial topic,

13  even if engaged in  by only a handful of people, will be "witnessed" by many more. Under the Permit Code, the

14  only political demonstrations that would be allowed without a permit would be those that no one would see.

15      For one thing, the vast majority of Las Vegas parks are designated as 'non-reservable' - allowing no

16  permits. In these parks, only demonstrations that would be viewed by fewer than 25 people (including

17  participants) are permitted. For most parks, this would limit demonstrations to odd times of the day, or for some

18  parks, only to times of inclement weather. For the minority of parks where groups are allowed, not only would

19  virtually every demonstration require a permit, complete with onerous insurance and notice requirements, but

20  approval would be at the discretion of the government. These conditions would also apply to a single hand-biller

21  who distributes leaflets to more than 24 passers-by. Such a scheme is impermissible for what the Supreme Court

22  has deemed the "quintessential public forum", *U.S. v. Grace*, 461 U.S. at 176.

23      Adding to the unconstitutionality is the practice of allowing the government  total and complete

24  discretion to ban any person or group from any and/or all parks for a lengthy period of time. This so-called

25  "86ing" involves no due process whatsoever and has been used, is being used, and will likely be used in the

26  future to discriminate against disfavored persons and messages in violation of the Constitution. As the *Thomas*

27  Court noted, content-neutral schemes to provide for the fair, safe and orderly use of parks can be created without

28  abridging Constitutional rights. The Las Vegas, scheme, however, does not fit that description.

**A.** **This Court Should Reaffirm its Finding That LVMC 13.36.055 is Unconstitutionally Vague and Violates the Fifth Amendment's Guarantee of Equal Protection**

After briefing and oral argument regarding the constitutionality of LVMC 13.36.055, this Court held that LVMC 13.36.055(6) was a facially invalid law, because it was unconstitutionally vague on its face by giving too much discretion to law enforcement, and that it violated Equal Protection because the City lacked a rational basis for such a law. *See* Transcript of Oral Argument, Exhibit 12. The Court also granted Plaintiffs a preliminary injunction preventing further enforcement of the law. In addition, Las Vegas Municipal Court Judge Assad threw out a criminal charge against Plaintiff Band under LVMC 13.36.055, issuing an oral ruling that the law was facially unconstitutional. *See* Transcript of Hearing Before Judge Assad, Exhibit 2.

Incorporating and reasserting all prior arguments made in previous filings and testimony before the District Court, Plaintiffs request that this Court extend the Court's preliminary holding to a permanent injunction against LVMC 13.36.055(6). During Oral Argument, both counsel for the Defendants and Judge Jones noted that the Preliminary Injunction was likely the final judgment on the merits of LVMC 13.36.055. *See* Transcript of Oral Argument, Exhibit 12, at 48, 57. The Court intended its preliminary injunction ruling to be a final guiding judgment, and the City noted its acceptance and had a prolonged discussion with the Court about how to revise the ordinance in a Constitutional manner. As such, it would be appropriate for this Court to simply apply the same rationale and find LVMC 13.36.055(6) unconstitutional and issue a permanent injunction.

**B.** **The Las Vegas Public Park Permitting Code is an Unconstitutional Infringement on the Rights to Free Speech and Assembly.**

**1.** **Restrictions on First Amendment Activities in a Public Forum are Subject to Strict Scrutiny and Must be Narrowly Tailored**

The regulation of speech in a traditional public forum, such as a public park, is subject to the highest scrutiny. *See Foti v. City of Menlo Park,* 146 F.3d 629, 635 (9th Cir.1998), *Mardi Gras of San Luis Obispo. v. City of San Luis Obispo*, 189 F. Supp. 2d 1018, 1027-28 (C.D. Cal. 2002). On its face, this ordinance severely limits the freedoms of speech or assembly of any group of people of 25 or more, whether defined as a "group use" (LVMC 13.36.080) or a "special event" (LVMC 13.36.132). Limitations on the ability to assemble or protest are clearly limitations on protected speech. *See Shuttlesworth*, 394 U.S. at 152 ("march and other protest activities clearly constitute protected speech"); *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir.1996) (First Amendment protects demonstrations and protests). Facial challenges to permitting ordinances

1   in a public forum have received strict scrutiny from the federal courts. *See Galvin v. Hay*, 374 F.3d 739, 746

2   (9th Cir. 2004); *Mardi Gras*, 189 F.Supp.2d at 1027; *S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1145 (9th

3   Cir.1998).

4          This line of cases concerning permit restrictions in public parks have held that any permit scheme

5   controlling the time, place, and manner of First Amendment activity must be (1) content-neutral, (2) be narrowly

6   tailored to serve a significant government interest, and (3) leave open ample alternative channels of expression.

7   *See Galvin v. Hay*, 374 F.3d at746*, citing Ward v. Rock Against Racism,* 491 U.S. 781, 791(1989); *S.O.C., Inc.*,

8   152 F.3d at 1145.   The failure to satisfy any of the three prongs leads to a finding that the statute is

9   unconstitutional. *Grossman v. City of Portland*, 33 F.3d 1200, 1205 (9th Cir.1994)*.* In addition, the government

10  bears the burden of showing that its permit scheme is narrowly tailored to serve a significant interest. *S.O.C.,*

11  152 F.3d at 1147.

12         Notably, Las Vegas has made no showing in the legislative history of the Permit Code that any attempt

13  was made to link the selection of 25 people to any government interest or harm to public property.  The City has

14  selected only 14 of its 64-plus parks for permitting, meaning that the City believes that the majority of public

15  parks are totally incompatible with any gathering of over 25 people.  The City bears the burden of establishing

16  that a total blackout of all groups of 25 or more from the majority of public parks is narrowly tailored in any

17  way.  The City has not offered any statistics on land area, bathroom facilities, parking, etc. for the 50-plus parks

18  where group use is completely prohibited to show a "significant" interest in criminally prohibiting all group use

19  of these public fora.  This lack of fit would seem to fail even a rational basis test, let alone the requirement for

20  narrow tailoring.

21              **2.      The Las Vegas City Park Permit Code is Impermissibly Content-Based**

22         LVMC 13.36.080 contains an exemption from the Permit Code to any group use "sponsored by the

23  Department."  This exemption necessarily applies the restriction on expressive use of the pubic parks differently

24  between those gatherings sponsored and condoned by the department, and those that are not.  Law enforcement

25  officers, in order to determine whether a particular gathering was violative of the Permit Code, would have to

26  investigate to determine who the "sponsor" of the expressive event was.  This exemption requires law

27  enforcement to enquire impermissibly into the nature of the expressive use before deciding whether the

28  gathering was subject to the Permit Code. *See also International Society for Krishna Consciousness,* 452 U.S.

9

640, 648-49 (1981) (Finding the permitting statute at issue content-based in part because "No person or organization, whether commercial or charitable, is permitted to engage in such activities except from a booth rented for those purposes."). Here, by contrast, law enforcement officers would need to enquire as to who was sponsoring any expressive groups use of the park prior to issuance of a citation. This is an impermissible preference for speech sponsored by the City.

In addition, the Permit Code as applied to Plaintiffs is content-based because it conditions the need for a permit on the number of witnesses to an event, not simply planned participants. This leads to a situation where a noncontroversial family picnic with 20 invitees is within the Permit Code, but a similar gathering of 20 protestors may be found in violation if 5 people - who either agree or disagree with them - stop to watch. The citations given to Plaintiffs Gail Sacco and Bartholomae show that the inclusion of "witnesses" to an event is more than just an empty threat. This application of the Permit Code therefore discriminated against groups who gather for expressive activity - and are more likely to generate controversy, counter-protests, and "witnesses." The risk of such changeable standards is that unpopular or controversial groups may be treated differently under the Permit Code due to the content of their speech. The Supreme Court has held that this type of content-based result is unconstitutional in a permitting scheme for a public forum. *Forsyth*, 505 U.S. at 133.

### 3. The Las Vegas City Permit Code is Not Narrowly Tailored, and Does Not Leave Open Adequate Alternative Channels of Communication

Plaintiffs believe that a mandatory notice and application policy for any group over 25 people is not narrowly tailored when the Permit Code allows such group use only in 14 of 65 public parks. In the vast majority of public parks in the City of Las Vegas, a gathering of 25 people or more is *always* subject to arrest and citation. The City has offered no basis for the very small selection of parks that are currently reservable, or why the other 50 plus parks are inherently inimical to group use.

The blackout of over 50 parks from any group use is, in and of itself, enough to defeat any claim of narrow tailoring. In a quintessential public forum, the government bears the burden of justifying restrictions on speech and expression in each locale. *See, i.e., S.O.C. v. County of Clark,* 152 F.3d 1136, 1147 (9th Cir. 1998). The *S.O.C.* Court found a lack of narrow tailoring, because the government had not given rationales for restricting handbilling in **each** geographic location where it was banned. The blanket no-leafletting ordinance on the Las Vegas Strip was overbroad because it restricted First Amendment activity "regardless of whether the

1   traffic, safety, and litter problems identified by Clark County exist at a given location." *Id.*

2   The City of Las Vegas, therefore, has a burden of establishing that group use of a park for expressive
3   purposes is inconsistent with each particular park, based on size, facilities, and the like. At present, the 14
4   reservable parks are neither the largest nor most developed parks in the City, and the City has offered no
5   evidence that a 25-person protest would be an incompatible burden in the 50-plus parks where such expressive
6   activities are completely banned. *See* Park Reservation Guidelines at 5, Exhibit 5.

7   Additionally, the exemption for Department-sponsored events belies any narrow tailoring in exemptions
8   from the Permit Code. Department-sponsored events may be held at any park in the City, without limitation or
9   notice requirements. Yet, group events sponsored by the City present no less of a threat of trash, traffic, or wear
10  and tear on park grounds and facilities, such as bathrooms. See *S.O.C.* 152 F.3d 1136, 1146-47 ("the record now
11  before us indicates that all canvassers, whether distributing commercial or non-commercial handbills, contribute
12  to the problems of sidewalk congestion, harassment of pedestrians, and littering.").

13  As the City has offered no reasons for why group use during events sponsored by the City present lesser
14  hazards than expressive group use by activists or protesters, who may indeed have a much smaller group of
15  individuals present, this exemption adds to the lack of narrow tailoring. Finally, the fact that the Department
16  may enjoy group use at all of Las Vegas' City parks contradicts any possibility that over 50 parks are non-
17  reservable due to some innate characteristic of the parks that is incompatible with group use.

18  Similarly, the total unavailability of most public parks for group use does not leave open ample
19  alternative channels of communication. A complete blackout from any gathering of 25 or more in the vast
20  majority of public parks by definition does not leave open alternative channels of communication. The public
21  parks are at the very core of First Amendment jurisprudence: the quintessential public forum. *See U.S. v.*
22  *Kokinda,* 497 U.S. 720, 726 (1990). The availability of garbage cans, restrooms, shade, and places to sit sharply
23  distinguish their character from that of streets, sidewalks, or private property. Indeed, the fact that camping was
24  available in **other parks** figured into the Supreme Court's analysis in *Clark v. Community for Creative*
25  *Nonviolence,* 468 U.S. 288, 295 (1984).

26  Plaintiffs Band, Edmonds, Gail Sacco, Joe Sacco, Huff, Bartholomae, Catholic Worker, Southern
27  Nevada Advocate for Homeless People, and Food Not Bombs in particular are most interested in engaging in
28  expressive activities where there is a substantial homeless population to minister and speak to. The parks with

11

the largest homeless populations in downtown Las Vegas, such as Circle Park, Frank Wright Park, and Baker Park, are not reservable parks.  Thus, the exclusion from certain parks for group use inherently prevents them from reaching the intended audience of their expressive activity.  *See, i.e., Galvin v. Hay,* 374 F.3d at 748 (choice of forum is important when "the location is one at which the particular audience the speaker seeks to reach is present.").  In the Ninth Circuit, the ability to reach one's intended audience is a crucial part of the ample alternatives test, even if the speaker's intent is geographically specific. *See  ACLU of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1106 (9th Cir.2003), cert. denied, 540 U.S. 1110, (2004) (striking down limits of Plaintiffs' ability to leaflet "to passersby" in a publicly-owned pedestrian mall); *One World One Family Now v. City and County of Honolulu*, 76 F.3d 1009, 1014-15 (9th Cir.1996);  *Gerritsen v. City of Los Angeles*, 994 F.2d 570, 573 (9th Cir.1993) ("Gerritsen has distributed his literature and made speeches in a variety of cities and parks in the Los Angeles area, but El Pueblo Park is one of his favorite sites because of its many Mexican American and Mexican visitors.").  The total unavailability of the bulk of public park space for any expressive group use is far from narrowly tailored, as evidenced by the Department-sponsored exemption, the lack of affirmative reasons given for each park's incompatibility with group use, and the lack of available alternative public fora.

> **4.    The Vague Standards of the Permit Code Fail to Provide Adequate Notice and Encourage Discriminatory Enforcement**

There are two statutes requiring permitting for any "Group Use" (over 25 people, LVMC 13.36.080); and for any "Special Event," (over 25 people, LVMC 13.36.134; 13.36.132): both include any event "in which it could reasonably be assumed that twenty-five people or more persons might gather."  Vagueness may invalidate a criminal law for either of two independent reasons.  First, it may fail to provide notice to enable "ordinary people [to] understand what conduct is prohibited;" second, it may authorize or encourage arbitrary and discriminatory enforcement *Kolender v. Lawson,* 461 U.S.352, 357 (1983).  The Las Vegas Permit Code fails on both counts.

The background leading up to Plaintiff Gail Sacco and Lyla Batholomae  receiving tickets for violating LVMC 13.36.080 is highly probative of the fact that the current wording of the duty to "reasonably assume 25 people or more might gather" is unconstitutionally vague.  Plaintiffs Sacco and Bartholomae repeatedly asked law enforcement officers monitoring their activity how the "participants" in their sharing of food would be

counted.  This was of particular concern for them, as they visited Circle Park as a group of 2 or 3 people ministering to individuals already present in the park.   As such, they did not feel like they had organized an event where 25 or more people "gathered," as the vast majority of individuals interacting with those sharing food were already present and gathered.  *See, i.e.,* First Declaration of Gail Sacco, Exhibit 7, at 2-3.

During several parkside discussions with law enforcement, and a meeting with City officials that included ACLU of Nevada employee and present counsel Lee Rowland, City officials gave numerous and varying accounts of how the "count" of participants was made.  Problematically, both City Attorney Brad Jerbik and a female law enforcement officer told Ms. Rowland that they had no way to know individuals in the park were "not together," and used the default assumption that anyone who looked poor was a participant as defined in LVMC 13.36.080.  In spite of attempts to hold separate events, arriving in different cars and actively keeping groups smaller than 25 people, Plaintiffs Sacco and Bartholomae were eventually cited for violating LVMC 13.36.080.  The language on their misdemeanor citations is extremely telling, as they were cited for having "25 or more people participate **or witness** such event without obtaining a permit."

No person could reasonably ascertain how many "witnesses" will be present for any certain event, and the inclusion of witnesses in the LVMC 13.36.080 "count" is proof that the law is impermissibly vague and subject to any number of interpretations.  Under this application of the law, any small but controversial group holding a protest who is likely to attract a number of counter-protestors, for instance, 2 KKK members in a park, could be cited for violating the ordinance if 23 "witnesses" showed up to the park, and they had not reasonably anticipated such attention prior to the event.  The varying applications of this law, as well as the inclusion of 'witnesses' to any event,  fail to give notice to a reasonable individual as to how they could reliably comport with the permit requirements of LVMC 13.36.080 or 13.36.132.

Alternatively, if a permitting ordinance vests too much discretion in government officials to deny disfavored speakers a permit under the ordinance, then such a law should be found as an impermissible prior restraint.  The facts in this case point overwhelmingly to the reality that the Permit Code is not only likely to, but is, applied in a discriminatory manner as applied to Plaintiffs.  The Supreme Court, in *Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002), recently examined this argument with respect to a permitting ordinance that bore similarities to the present Permit Code.

The Court's approval of the Permit Code at issue in *Thomas* was based on its holding that the content-

13

neutral rules in *Thomas* adequately protected against discriminatory enforcement:

> "Of course even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression. Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content."

The *Thomas* Court found that the Permit Code in that case **did** adequately prevent officials from denying permits to disfavored speakers. Nothing in *Thomas* ever suggested that content-neutral rules protected the government from a constitutional challenge to the abuse of applying those rules in a discriminatory manner. Just the opposite: the holding in *Thomas* was premised on the fact that the government was acting in good faith. Such is not the case here, unfortunately, where the City Attorney has stated on the record that Plaintiffs would "never" receive a permit, and where law enforcement resources were used to lie in wait for the moment Plaintiffs crossed the line of 25 "witnesses" to their sharing of food.

The specific reasons for denial of a permit in *Thomas* also differ greatly from those available in Las Vegas. The permit-denial requirements that were most susceptible to discretion were those that prohibited permits for activities "inconsistent with the classifications and uses of the park or part thereof designated pursuant to this chapter...[or that] would present an unreasonable danger to the health or safety of the applicant, or other users of the park, of Park District Employees or of the public." *Id.* at 320 n.1. The requirement in *Thomas* linked disfavored use to existing policies, or use that would present an 'unreasonable danger.' The Court found that these are objective criteria that could be fairly enforced.

In the Las Vegas Permit Code, by contrast, a group use or special event permit may be denied under LVMC 13.36.090 to "Protect the use and enjoyment of the park or facility for other members of the public or "ensure that the group use does not disturb or annoy persons who occupy land which is nearby such park or facility." Unlike the standards in *Thomas,* this discretionary denial language is not directly tied to existing prohibitions, criminal activity, or public danger. Instead, they encompass such inherently vague terms as "enjoyment" and "annoy", which may clearly be interpreted to deny permits to certain disfavored residents in favor of the "enjoyment" or lack of "annoyance" of other individuals. Such vague terms vest an impermissible degree of discretion in the Department of Leisure Service, which would be likely to deny permits to more controversial or anti-establishment groups seeking permits based on their likelihood of annoying or reducing the enjoyment of other park goers and neighbors. Finally, unlike in *Thomas,* the Department does not have to

14

issue a written opinion detailing its reasons for denial of a permit, which is a further check on capricious denials. *See Thomas,* 534 U.S. at 324.

However, even if this Court should find these requirements to be indistinguishable from those found appropriate in *Thomas,* there is no need to speculate in the instant case whether the permit denial standards will be enforced in a discriminatory manner against Plaintiffs in this case. Law enforcement spent days and countless public resources specifically surveying Plaintiffs' activity prior to their citation with the intent to cite them as soon as they could come up with a skewed "count" of 25 or more people in a park, including "witnesses." Further, the City Attorney stated on the record during oral argument in this case that the Department would automatically deny any permit to Plaintiffs based on their disfavored, but not illegal, use of the park (Transcript of Oral Argument at 30-31, Exhibit 12):

> MR. JERBIC: The fact though, Your Honor, and I'll be quite candid with the Court, we will never give a permit to somebody who comes to us and says: I'm going to have a gathering of twenty-five or more in Circle Park. We're going to say: What's the purpose? And they're going to say: To do a homeless feeding. And we're going to say: No, we're not going to give that permit. THE COURT: Well, I'm not sure that you can ask that question. I don't think it's necessarily appropriate to ask that question. I've got no problem with your saying a park can be small enough that we won't permit large groups for feedings. I think that may be an appropriate line. In other words, if your park is large enough, you've got to accommodate groups as well as individual use. That's public use. MR. JERBIC: Absolutely. THE COURT: And I can imagine that an appropriate line is drawn on your side for saying we will not license groups if the park is too small, with an area designation and appropriate legislative history that tells us that, that groups -- a park cannot be maintained, or individual use as well cannot be maintained if the park is too small. I'm willing to buy even that, although that's a little gray. But here you've gone beyond that....MR. JERBIC: Because indigents, whether people want to say it or not, put a different burden on public services than other members of our population."

This testimony shows a disturbing policy on the part of the City of Las Vegas to view groups of indigent persons, or even groups of people looking to interact with indigent persons, in a disfavored manner, in the absence of any criminal or dangerous activity. *See also Shuttlesworth,* 394 U.S. at 153 ("a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions regarding the potential effect of the activity in question on the 'welfare,' 'decency,' or 'morals' of the community.")

Furthermore, the City Attorney assured that Court that other groups *would* be granted permits in Circle Park: "THE COURT: And do you license any large groups over twenty-five for Circle Park? MR. JERBIC: We would. The neighborhood has had neighborhood association barbeques there, I've been informed, where they will come in and they will get a permit if they're going to have twenty-five or more. We'll give them a permit,

1  they'll have their barbeque." Transcript of Oral Argument, at 36-37, Exhibit 12. This is particularly surprising

2  in light of the fact that Circle Park is and has always been a non-reservable park.

3      This reliance on the vague standards in LVMC 13.36.090 shows that the City of Las Vegas is engaging

4  in the type of discriminatory enforcement of the Permit Code that the *Thomas* Court specifically noted would

5  undermine their holding.  The Court in *Thomas* wrote: "Granting waivers to favored speakers (or, more

6  precisely, denying them to disfavored speakers) would of course be unconstitutional, but we think that this abuse

7  must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree

8  of rigidity that is found in few legal arrangements."  534 U.S. at 325.  The vague language of "annoyance" and

9  "enjoyment" allows for and encourages this form of impermissible permit denial, especially in absence of a

10  written finding for reasons of denial. This lack of objective criteria differentiates this case from that in *Thomas*.

11  *See Mardi Gras,* 189 F.Supp.2d 1018 *at 1029 n.9 ("Thomas* does not stand for the broad proposition that a party

12  cannot challenge a time, place or manner ordinance unless a pattern of prohibitive implementation has been

13  shown. Indeed, the Supreme Court in *Forsyth* held that "the success of a facial challenge on the grounds that

14  an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has

15  exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing

16  him from doing so." *Forsyth*, 505 U.S. at 133 n. 10.")**.**

17      It is clear that nothing in this ordinance prohibits the City from exercising it permitting authority in a

18  capricious or discriminatory manner, as they have explicitly stated they will do with respect to the indigent. This

19  is precisely the "pattern of unlawful favoritism" that the *Thomas* Court itself disclaimed as being incompatible

20  with its approval of the permitting standards in that case.

21              **5.    The Permit Code Violates Equal Protection as Applied to Plaintiffs**

22      LVMC 13.36.080 contains an exemption from the Permit Code to any group use "sponsored by the

23  Department." This exemption necessarily applies the restriction on expressive use of the public parks differently

24  between those gatherings sponsored and condoned by the department, and those that are not.  As Plaintiffs' use

25  of the parks is inherently expressive - their group gatherings are for the purpose of protest (Food Not Bombs),

26  religious worship and ministry (Plaintiff Huff and Catholic Worker), and other expressive activity such as

27  tabling, handing out membership forms or holding press conferences (ACLU of Nevada), the Permit Code

28  implicates fundamental First Amendment rights.  When First Amendment rights are implicated, facial

distinctions in a government act must be regarded with the highest scrutiny. "Because...[the] ordinance regulates First Amendment speech in a traditional public forum, any distinctions the ordinance draws must be finely tailored to serve the substantial interests of the City." *A.C.L.U. of Nevada v. City of Las Vegas*, 466 F.3d 784, 799 (9th Cir. 2006), citing *Carey v. Brown*, 447 U.S. 455, 461-62 (1980).

In *A.C.L.U. of Nevada*, the Court examined a no-tabling ordinance with an exemption for tables brought by labor unions. The exemption is directly analogous to the Permit Code's exemption for all Department-sponsored activity. Due to the requirement for narrow tailoring in distinctions among classes for the purposes of a law affecting First Amendment rights, the Court found that the anti-tabling ordinance violated Equal Protection as applied to Plaintiffs tabling for expressive purposes. *Id.* at 799-800. The instant Plaintiffs, similarly, are those who use the park system for expressive purposes, and are subject to more stringent requirements than any group use sponsored by the Department of Leisure Services. Since the ostensible purpose of the park reservation system is to prevent conflicting use and damage to the park, these concerns are equally present regardless of the sponsor of the event. As such, this ordinance, exactly like that in *A.C.L.U. of Nevada*, lacks the required fit of fine tailoring, and violates the Fifth Amendment's guarantee of Equal Protection as applied to Plaintiffs.

### 6. The 14-Day Advance Permit Requirement Creates an Impermissible Chill on Protected Speech

LVMC 13.36.134 requires 14-day advance notice of any 'Special event,' defined as "any event or activity, including without limitation picnics, that will be held in a City park or other City facility and at which twenty-five or more persons may reasonably be anticipated to be in attendance." The language of the "special event" definition is identical to that of any group use. As such, every "group use" of 25 or more people must give 14-day advance notice to the Department of its desire to use the parks. LVMC 13.36.134. Advance notice requirements are looked on with great disfavor in the Ninth Circuit as a prior restraint on speech. *See Mardi Gras,* 189 F.Supp.2d at 1026 ("The Ninth Circuit has held that "[a]ll advance notice requirements tend to inhibit speech.") (internal citations omitted).

In prior cases before the Ninth Circuit, 60-day (*Mardi Gras,* 189 F.Supp.2d at 1026); 20-day (*NAACP v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir.1984)), 7-day (*Grossman*, 33 F.3d at 1206), and even one-day (*Rosen v. Port of Portland*, 641 F.2d 1243, 1247-50 (9th Cir.1981) notice requirements as applied to expressive

17

activity. The crucial test is whether the notice requirement "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799.

Here, a group of 25 people is not a sufficiently large enough group to require two weeks of notice. Since most parks are non-reservable, this means that a group of protestors intent on publicizing a current event would have choose from a very limited number of reservable parks, submit a notice, and wait two weeks for a determination of whether they might gather. This is clearly a burden on political speech that is not carefully tailored to the needs of each reservable park, particularly when so few public fora are available for group use. *See Grossman,* 33 F.3d at 1206 ("Some type of permit requirement may be justified in the case of large groups, where the burden placed on park facilities and the possibility of interference with other park users is more substantial."); *Rosen*, 641 F.2d at 1248 n. 8 (stating that even if 24-hour advance notice requirement were justified for large groups, it sweeps too broadly in regulating small groups).

*Thomas* examined a permit scheme that required a 14-day advance notice for a 50-person event, not counting witnesses, but Plaintiffs in that case did not allege that the permitting system was not a narrowly-tailored time, place or manner restriction. The Court in *Thomas* specifically disclaimed any such effect of its holding. 534 U.S. at 323 n.3**.** In the Ninth Circuit, all advance permit requirements that burden expression are looked at with the most exacting scrutiny. A period of 14 days from every event involving the relatively small number of 25 people "reasonably expected" to attend or witness does not survive this strict scrutiny.

### 7.   The Insurance Provisions of the Permit Policy for "Special Events" Violate the First Amendment

Las Vegas Municipal Code Section 13.36.138 states that applicants for permits "shall pay all of the additional costs that the City incurs, in excess of those that it incurs in connection with its normal maintenance of the park or facility in which the special event is held, as the direct result of the special event for which such permit is issued...includ[ing] without limitation the City's expenditures that are associated with the personnel and equipment that it uses in preparing for, supervising and cleaning up after such event." This section of the Permit Code allows the City to be reimbursed for supervising personnel, including presumably the cost of police protection and monitoring.

The Supreme Court held that any fee charged as a condition of obtaining a permit be devolved from "narrowly drawn, reasonable and definite standards," *Forsyth*, 505 U.S. at 133. The risk without such explicit

1    and narrow standards is that unpopular or controversial groups may be charged more for the police presence

2    necessary as a result of the content of their speech.  *Id* at 134.  The Las Vegas Municipal Code contains no

3    specific guidelines as to how such an additional fee will be calculated.  The Parks Reservations Office permit

4    guidelines do state that "Renter will be responsible for the overtime cost for City Marshal support," but does

5    not give any specific guidelines or criteria other than a "meeting" with City staff and law enforcement prior to

6    the event.  *See* Park Reservation Guidelines, Exhibit 5, at 1.

7         The LVMC Permit Code fails to include any definite or narrow standards for the provision of extra fees,

8    and specifically includes police protection charges.  As such, it is an impermissible prior restraint on expressive

9    activity under the standards outlined in *Forsyth.*

10       **C.**    **Children's Only Parks Restrict Speech in a Quintessential Public Forum**

11        As set out above and in the affidavits in this case, all Plaintiffs engage in expressive activity in the public

12   park system**.**  The ACLU of Nevada, Food Not Bombs, SNAHP, and Catholic worker are all non-profit

13   organizations that rely on the parks as a free and democratic forum for group expression, from protest to

14   membership solicitation to charity to proselytizing.  Several public parks have now been declared off-limits to

15   those adults wishing to gather for expressive purposes. The public park is the quintessential public forum, where

16   First Amendment rights have their fullest effect.  *See, i.e., U.S. v. Grace*, 461 U.S. at 176.  It is axiomatic that

17   "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may

18   be exercised in some other place."  *U.S. v. Schneider*, 308 U.S. 147, 163 (1939).  Exclusion from a quintessential

19   public forum necessarily limits individuals' and groups' venues for free speech, particularly in certain

20   neighborhoods where the nearest public park may be miles away.

21        Similar to a permitting scheme, the Children's-Only Park ordinances restrict all adult access to places

22   that were established as public fora for all residents.  For Plaintiffs, this necessarily means geographical

23   restrictions on their ability to assemble, for instance to count and minister to the homeless population, activities

24   in which SNAHP, Catholic Worker, and Food Not Bombs all engage.   Limitations on the ability to assemble

25   or protest are clearly limitations on protected speech.  *See Shuttlesworth,* 394 U.S. at 152 ("march and other

26   protest activities clearly constitute protected speech"); *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir.1996)

27   (First Amendment protects demonstrations and protests).  The Children's-Only Park Ordinances thus reduce

28   the available forum space for free speech, assembly, and protest, and should thus be subject to strict scrutiny.

*See Foti v. City of Menlo Park,* 146 F.3d 629, 635 (9th Cir.1998), *Mardi Gras*, 189 F.Supp.2d at 1027-28. Defendants cannot make this showing.

Even if this Court believes that the Children's Only Park ordinances do not infringe on protected speech, the Children's-Only Park ordinances also violates the guarantee of Equal Protection.  The City has determined to open certain of its parks only to people who have or watch children.  Just as the City linked all 'indigent' adults to their fears of criminal behavior in LVMC 13.36.055(6) (*See* Transcript of Oral Argument at 34-35, Exhibit 12), here the City has instead laid the blame for criminal behavior at the feet of childless adults.  The City has made no showing that adults who enjoy the use of public space without children present are more likely to engage in criminal activity.

Under either Equal Protection or a general rational basis test, the Children's-Only Park ordinances fail. The reasons given for the ordinance, and its effect, are strikingly similar to the fit of LVMC 13.36.055(6), which failed the rational basis test before this Court.  As with LVMC 13.36.055, the creation of Children's-Only Parks was prompted by neighborhood concerns about criminal activity.  The record reflects that the purpose of the Children's-Only Parks enacting ordinance was to respond to "complaints about drug and alcohol-related activity, sexual activity, and violence."  *See* Children's-Only Parks Legislative History, Exhibit 8, at 1.  Similarly, the Resolution creating three new Children's Only Parks (*See Id.* at 2) noted the activities present in parks to include "alcoholic beverages, drug use, other drug-related activities, violence and the threat of violence, sexual activity, and sleeping."  Then-Neighborhood Services Department Deputy Director Morse Arberry told the Las Vegas Sun that "the amount of homeless individuals living in the parks" were a primary reason for the Children's-Only designation. *See* Erin Neff, "Controversy Surrounds Ordinance Boosting Kids' Use of Neighborhood's Parks,' Exhibit 9, at 2.

Of the three parks designated as 'Children's Parks" in 1999 (James Gay Park, Ethel Pearson Park, and Fitzgerald Tot Lot), only one was designed as a park "intended primarily for the use of children 12 years of age or younger," the definition of Children's Park listed in the Resolution.  Children's-Only Parks Legislative History, Exhibit 8 at 2.  All, however, are in historically poor and minority areas of Las Vegas.  Pearson Park was the site where Catholic Worker volunteers came daily to offer coffee to the poor - notably, they had previously done so in Circle Park, until neighbors' complaints prompted the City to request that they move to Pearson.  *See* Erin Neff, Exhibit 9, at 3.  Now, since the designation of Pearson Park as only for kids, Catholic

1   Worker volunteers no longer go into the parks to minister and share coffee.  This pattern mirrors the City's

2   tactics in passing LVMC 13.36.055 - target criminal activity by reducing access to public space.

3        Just as with LVMC 13.36.055(6), however, the City's true intentions are belied by the lack of rational

4   basis for its action.  If the concern was to combat criminal activity in public parks, the City Council could have

5   passed new ordinances targeting that activity, or if they already existed, tasked law enforcement with increased

6   enforcement of those laws. (See, January 26, 2007 Order, p.23. ) Combatting generic criminal activity was the

7   exact justification given by the City for LVMC 13.36.055(6).  During oral argument, the City Attorney conceded

8   that the Council had not passed criminal laws targeted against the complained-of activity, such as being drunk

9   in the park.  *See* Transcript of Oral Argument at 34, Exhibit 12.  After noting the absence of several laws

10  relevant to the City's goals of targeting criminal activity, Judge Jones inquired as to why the City doesn't

11  "address all of these dangers you're talking about by specifically tailored regulations?" *Id.* at 35.  The City has

12  again repeated this failure to enact criminal statutes rationally related to their goals, and again done so by passing

13  a blanket resolution restricting access to public park space.

14       If, by contrast, the purpose was the creation of parks designed for 12 year olds, the construction of these

15  parks, which was for general public use, does not fit with that mission.  Indeed, on the Department of Leisure

16  Services' website, the Department touts the available activities in Pearson and James Gay Parks - including

17  basketball, jogging paths, a roller hockey rink, pavement games, and a skate park.  Department of Leisure

18  Services Website, available at http://www.lasvegasnevada.gov/Find/parks_facilities.asp#.  There is no mention

19  of any age restrictions on the detailed information page for both parks, and roller hockey and skate parks are not

20  the kind of attractions to typically draws youths under 12, due to their inherent dangerousness.  The facilities,

21  the advertisement of those facilities, and the lack of any mention of the children's-only restriction contradicts

22  the legislative finding that "Children's-Only Parks" are designed for youth use.

23       In either situation, the City's stated goals simply do not match the tactics taken in creating Children's-

24  Only Parks.  Instead, as with LVMC 13.36.055(6), the City has taken steps to seal off public park space from

25  those considered "undesirable" by the City - and who have no less right to access public forum space than

26  anyone else.  By reacting to criminal activity in such a manner, the City plays fast and loose with historical

27  public space and reduces the available fora for expressive group use.

28       **D.     The Las Vegas Trespass Policy is an Unconstitutional Deprivation of the Rights to Due**

**Process and Freedom of Movement, and is Impermissibly Vague**

**1.    This Policy Impinges on the Fundamental Right of Free Movement and Should Receive Strict Scrutiny**

When fundamental rights are implicated by a policy's enforcement, the federal courts have applied strict scrutiny to the challenged government action.  The Trespass Policy of the City of Las Vegas directly implicates and infringes upon the fundamental right of freedom of movement, and therefore should trigger strict scrutiny. The fundamental right to freedom of movement is well-established in the Ninth Circuit.  See, i.e., *Williams v. Fears*, 179 U.S. 270, 274 (1900) (the right, ordinarily, of free transit from or through the territory of any state is a right secured by the 14th Amendment and by other provisions of the Constitution); *United States v. Wheeler*, 254 U.S. 281, 293 (1920) ("In all the [s]tates from the beginning down to the adoption of the Articles of Confederation the citizens thereof possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective [s]tates, to move at will from place to place therein, and to have free ingress thereto and egress therefrom...."). *Kolender*, 461 U.S. at 358 (finding that the challenged loitering statute "implicate[d] consideration of the constitutional right to freedom of movement"); *City of Chicago v. Morales*, 527 U.S. 41, 53-54 (1999) (the freedom to loiter is the "right to remove from one place to another according to inclination" and is "'an attribute of personal liberty' protected by the Constitution").

The Ninth Circuit has expressly held the right to free movement to be fundamental.  *Nunez v. City of San Diego*, 114 F.3d 935, 946 (9th Cir. 1997) (applying strict scrutiny to strike as unconstitutional a juvenile curfew ordinance that encroached the fundamental right of free movement). There is no question that the Trespass Policy of the City of Las Vegas impinges on this fundamental right in much the same way as a curfew or anti-loitering ordinance.  This policy gives police officers unfettered rights to exclude someone from public land in a manner completely devoid of due process.  The right to access public land is inherent to the right of freedom of movement.  *See Morales*, 527 U.S. 41, 52 (1999) ("Indeed, it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is "a part of our heritage'," citing *Kent v. Dulles*, 357 U.S. 116, 126 (1958)).

The City of Las Vegas's Trespass Policy allows officers to exclude individuals from public lands for long periods of time on their own initiative.  This impacts the fundamental right to free movement, and therefore should receive strict scrutiny from this Court.

**2. The City's Trespass Policy Completely Denies Due Process to Those Trespassed.**

The Due Process clause of the Fourteenth Amendment ensures that the government does not destroy a property or liberty interest without adequate procedural protection. The lack of procedures by which an individual can challenge or appeal a City Trespass Order either before or after it is given violates the fundamental guarantees of procedural due process, which are guaranteed by the Fourteenth Amendment and by Article I, § 8 of the Nevada Constitution.  It is axiomatic that procedural due process requires that the government provide a fair process before depriving a person of a constitutionally protected property or liberty interest.  *See, e.g., Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982).  "We must first ask whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of 'life, liberty or property;' if protected interests are implicated, we must then decide what procedures constitute 'due process of law.'" *Ingram v. Wright*, 430 U.S. 651, 672 (1977) (citations omitted).

Plaintiffs' fundamental right to freedom of movement and assembly is a protected fundamental right under the U.S. and Nevada Constitutions.  See *Williams v. Fears*, 179 U.S. 270, 274 (1900); *United States v. Wheeler*, 254 U.S. 281, 293, 41 S.Ct. 133, 134 (1920);  *Kolender*, 461 U.S. at 358; *Morales*, 527 U.S. at 53-54 (the freedom to loiter is the "right to remove from one place to another according to inclination" and is "'an attribute of personal liberty' protected by the Constitution"); *Nunez v. City of San Diego*, 114 F.3d at 946 (explicitly identifying the right of free movement as fundamental); NV CONST Art. 1, Sec. 10.  The City of Las Vegas' Trespass policy, which has no administrative procedures or appeal whatsoever, cannot meet the stringent requirements for denial of this fundamental right.

The test for due process is determined by balancing:  (1) the private interest that will be affected by the state action; (2) the risk of erroneous deprivation through the procedures used; and (3) the governmental interest, including additional cost and administrative burdens that additional procedures would entail.  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  "Due process requires an opportunity to be heard at a meaningful time and in a meaningful manner."  *Roley v. Pierce Co. Fire Prot. Dist. No. 4*, 869 F.2d 491, 494 (9th Cir. 1989) (citation omitted).

The private interests in this case are the fundamental right to freedom of movement, and the constitutionally established right to enjoy due process prior to that right being curtailed.  This "private" interest also dovetails with the State's interest in upholding the Constitution and laws.  In addition, any order of Trespass is the possible basis for a criminal charge of Trespassing, based solely on the existence of the prior Trespass

23

1    order.  As such, this statute affects the private interests of free movement, liberty, and due process, the

2    fundamental building blocks of our Constitutional democracy.

3         In addition, there exist huge risks of "erroneous deprivation" of constitutional rights under the current

4    amount of process (which is none).  Trespass orders are given and enforced unilaterally by law enforcement

5    officers who patrol public parks.  It is possible and even probable that an officer is more likely to Trespass an

6    individual who is "annoying," or with whose speech he disagrees.  This system permits an officer, with no

7    oversight, to expel individuals from a public forum based on the content of their speech or their appearance.

8    There is absolutely no recourse - no system of appeal or opportunity to be heard - if a Trespassee believes he

9    was Trespassed for invalid reasons.

10        The ability of an officer to impose the Trespass penalty is based entirely on an individual officer's whim.

11   If the city wanted to impose a ban on being in public park space as part of a punishment for criminal behavior,

12   such punishment must be included legislatively as part of the criminal process, rather than left to the whim of

13   police officers dealing with individuals they may choose to double-penalize out of dislike or inconvenience.

14   The Supreme Court is clear that government has the power to enact criminal penalties, but not to leave them to

15   the entire discretion of police.  *See Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) ("It cannot

16   constitutionally do so through the enactment and enforcement of an ordinance whose violation may entirely

17   depend upon whether or not a policeman is annoyed [citations omitted].)"

18        The first two prongs of the due process test tip heavily in favor of affording due process.  As to the third

19   prong, the burden on the state, the Courts have already established that the balance lies wholly in favor of due

20   process protections for a fundamental right.  Where as here the statute is hostile to the exercise of freedom of

21   movement - a fundamental liberty interest - the process due plaintiffs is the opportunity to be heard prior to the

22   determination.  *See, e.g., Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542-43 (1985) (discussing case

23   law affording pre-deprivation hearings in the context of property interests).  The statute does not provide for

24   a pre-deprivation hearing.  In fact, the statute does not provide for a hearing even after an individual has been

25   banned from public property.  The statute fails to set forth any guidance as to how an individual may challenge

26   (judicially or otherwise) a decision banning him or her from the public property.

27        The only "process" available under the statute is for an individual to knowingly violate the ban and be

28   arrested or cited for criminal trespass, but even then there is no provision for challenging the validity of the

initial banning during a criminal proceeding.  Rather, the only issues in a criminal case are whether a warning was issued and whether the person returned to the public property. The lack of any fair and impartial process to protect Plaintiffs' and the public's fundamental rights denies procedural due process in violation of the Fourteenth Amendment to the U.S. Constitution and Article I, § 8 of the Nevada Constitution.  The Court should thus enjoin enforcement of the statute as to public property to ensure that these fundamental rights are not continually deprived without due process of law.

### 3.    The City's Trespass Policy is Impermissibly Vague

Vagueness may invalidate a criminal law for either of two independent reasons.  First, it may fail to provide notice to enable "ordinary people [to] understand what conduct is prohibited;" second, it may authorize or encourage arbitrary and discriminatory enforcement.  *Kolender*, 461 U.S. at 357.  The Las Vegas trespass Policy fails on both counts.

This Policy fails the first vagueness test, because it does not notify ordinary people of prohibited conduct. Both Gail Sacco and Lyla Bartholomae, who were both Trespassed by City Marshals, had no expectation of receiving Trespass orders, as they were attempting to comply with established law at the time of their citations. Both women were aware of the Trespass system, as both know many individuals who have been "86"ed. However, as there is no written or formal Trespass law, neither knew what conduct could instigate a Trespass Order.  Clearly, any formal City policy that has no written equivalent in the criminal law provides absolutely no notice of prohibited conduct. The City Trespass Policy is contained within the Las Vegas Metropolitan Police Force's "Field Interviews" section, which makes clear that "probable cause for arrest is not required [for field interviews], but reasonable suspicion is." *See* Marshals Trespass Policy, Exhibit 4, at 1. Under the "Trespass" section, although the definition allows officers to "Trespass subjects from city property for criminal violations," (emphasis added), it also goes on to detail procedure when apart from the Trespass order, "no other report is generated; i.e. arrest or citation."  *See* Marshals Trespass Policy, Exhibit 4, at 3.  Thus, the policy clearly contemplates the giving of Trespass orders even when no other criminal act is alleged or documented.

The only time when a subject knows what conduct may lead to a Trespass Order is upon receipt of this Order, which the Court in *Morales* specifically noted was constitutionally infirm (527 U.S. at 59):

> "Because an officer may issue an order only after prohibited conduct has already occurred, it cannot provide the kind of advance notice that will protect the putative loiterer from being ordered to disperse. Such an order cannot retroactively give adequate warning of the boundary between the permissible and

1    the impermissible applications of the law."

2    This is exactly the situation experienced by Plaintiffs; the existence of a Trespass penalty in response to their

3    actions was not identified until the literal moment when they received oral Trespass Orders.   Such a system,

4    with a total absence of formal or written notice to individuals, is facially invalid.

5           Even if the city should argue that since the Trespass order hinges on existing criminal conduct, and

6    therefore incorporates the same notice as all criminal laws on the books combined, the vagueness concerns are

7    not satisfied.  As noted above, the Trespass policy itself contemplates Trespass Orders given in absence of other

8    criminal citation.  In addition, sample Trespass Logs, which are kept by the Marshals to keep track of individuals

9    who are prohibited from public land, show that numerous Trespass Orders have been given out where no

10   criminal violation has been documented.  Listed "offenses" as a basis for Trespass include such non-criminal

11   behavior as: 'Trespass', 'Trespassed', 'Misuse,' and 'Sleeping.' *See* Las Vegas Marshals Trespass Log,  Exhibit

12   10, at 1-4.    The tag "trespassed" presumably refers to individuals present in public space where they had

13   previously received a Trespass Order.  The original "offense" is not listed with these Field Interviews.

14          More fundamentally, however, even if *arguendo* all Trespass Orders hinged on criminal conduct, the

15   penalty of a six-month Trespass Order from public space is a separate and distinct punishment from the

16   underlying crime, which includes no due process.  Government has the power to enact criminal penalties, but

17   not to leave them to the entire discretion of police *See Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971).

18   The Supreme Court recognized as early as 1876 that "It would certainly be dangerous if the legislature could

19   set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could

20   be rightfully detained, and who should be set at large." *United States v. Reese*, 92 U.S. 214, 221 (1875).  *See*

21   *also Papachristou v.  City of Jacksonville*, 405 U.S. 156, 165(1972) (invalidating vagrancy ordinance because

22   it "increase[d] the arsenal of the police" by widening the criminal net without appropriate probable cause

23   standard of guilt).

24          *Papachristou*'s admonition against lowering the standard of arrest or citation below one of probable

25   cause is particularly relevant here, where an email from Deputy District Attorney Ben Little to the Deputy City

26   Marshal Unit noted that "we need to show people trespassed off of public or semi-public property are trespass

27   for 'good cause.' [sic]." Email from Ben Little, 10/13/2003, Exhibit 11.   Clearly, "good cause" is a standard

28   significantly lower than the probable cause required for arrest.  Thus, both the email and the policy create a

totally discretionary system with no specific guidance on how to distribute Trespass Orders.  In actuality, the Trespass ordinance is far worse than the laws at issue in *Reese* and *Papachristou*, because unlike other criminal laws, the Trespass system affords no due process whatsoever.  The standard lower than probable cause added to the total absence of due process makes for a potent combination that presents a grave risk to citizens' liberty.

The constitutional infirmity of vagueness may also exist where a government law or policy presents too great a risk of selective or discriminatory enforcement.   The *Kolender* Court recognized "that the more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine--the requirement that a legislature establish minimal guidelines to govern law enforcement.' 461 U.S. at 358, quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974).

In *City of Chicago v. Morales*, 527 U.S. 41 (1999), the Supreme Court struck down an ordinance that allowed police to order a group in a public place to disperse if the group included a street gang member and the group remained "in any one place with no apparent purpose." 527 U.S. at 41.  Failure to obey the dispersal order resulted in arrest.  The Court struck the ordinance as unconstitutionally vague on its face because it failed to "establish minimal guidelines to govern law enforcement." Id. at 60 (quoting *Kolender*, 461 U.S. at 358).

The concept that police officers may not be given free reign with standardless laws is hardly new.   In *Shuttlesworth v. City of Birmingham*, 382 U.S. 87 (1965), the Supreme Court invalidated an ordinance allowing officers to ticket anyone who did "stand or loiter upon any street or sidewalk of the city after having been requested by any police officer to move on." Id. at 88.  The Court noted that a law whose enforcement depends on "moment-to-moment opinions of a policeman on his beat…bears the hallmarks of a police state."  Not only does this policy vest far too much power in street officers, but that discretion holds possibilities for discriminatory enforcement.

Outside evidence shows that the fear of discriminatory enforcement is not an empty threat in Las Vegas. Plaintiffs Gail Sacco and Lyla Bartholomae, cited for feeding too many homeless individuals without a permit, were immediately trespassed.  Officers had been coming to Circle Park and monitoring Plaintiffs' activities for days, videotaping some interactions with Plaintiffs.  Plaintiffs were being targeted for their practices which were not otherwise illegal, and were given oral Trespass Orders upon receipt of their citations for violating the City Permit Code, with which they were attempting to comply after repeated interaction with law enforcement and City employees.  Plaintiffs were therefore given no notice nor opportunity to ascertain how precisely not to get

27

1  Trespassed.

2        Since city officials have overtly stated that both LVMC 13.36.055(6) and the permitting process would
3  be selectively enforced against Plaintiffs and the homeless, there is a parallel spectre of discriminatory
4  enforcement of the Trespass policy.   The open-ended permissiveness of the Trespass policy therefore clearly
5  "contains an obvious invitation to discriminatory enforcement against those whose association together is
6  'annoying' because their ideas, their lifestyle, or their physical appearance is resented by the majority of their
7  fellow citizens." *Coates*, 402 U.S. at 616.  See also *Papachristou*, 405 U.S. at 170(It furnishes a convenient tool
8  for harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to
9  merit their displeasure.") (internal citations omitted).   The result of the Trespass policy, particularly when
10  authorized as an ancillary punishment to the new LVMC 13.36.055, puts those on public land in fear of how
11  their appearance will be judged by police officers.  This is precisely the type of "police state" the *Shuttlesworth*
12  Court warned against.  The invitation to arbitrary enforcement against those disfavored by the cops is of
13  particular concern because a bar under the City's Trespass policy inhibits the exercise of First Amendment rights
14  of speech and association and also infringes upon the right to freedom of movement in the quintessential public
15  forum. *Kolender*, 461 U.S. at 358.

16        When Law enforcement officials are given complete freedom, without standards, to determine when to
17  and when not to enforce the statute, this invites arbitrary and discriminatory enforcement.  Both the sheer
18  absence of guidelines in this policy, and its failure to give notice of prohibited conduct, render the Trespass
19  policy of Las Vegas, like the ordinances in *Kolender*, *Coates*, and *Morales*, unconstitutionally vague on its face.
20  This policy completely fails this constitutional requirement " that a legislature establish minimal guidelines to
21  govern law enforcement." *Kolender*, 461 U.S. at 358 (citation omitted).  As there is no legislative authority for
22  the Trespass policy from the city or state, both the policy and 'guidelines' have been fabricated out of whole
23  cloth by the executive departments in the City of Las Vegas.

24  **VIII.    Conclusion**

25        All of the regulations at issue in this case revolve around the same theme - restricting access to public
26  park space.  The Permit Code restrict virtually all access for groups larger than 25 - and in doing so, almost all
27  protest and organized expressive group activity such as proselytizing, outreach, and even press conferences.  In
28  those few places where group permits are available, notice, insurance, application fees, and the unpredictable

enforcement create a very real burden for all group speech and protest.  The Children's Park ordinances place even more public space outside the First Amendment, and irrationally restrict public fora to all childless adults, whom the City targets instead of criminals.  Even in the precious few areas where group use is permitted by the City, individual officers' unilateral right to Trespass anyone they dislike of public land remains a very real threat, and past experience, for Plaintiffs who help the poor and homeless, and whose tactics are publicly disfavored by the City of Las Vegas.

The City of Las Vegas has doggedly passed ordinances, under the guise of protecting the public, that do little more than give law enforcement tools to arrest or Trespass those deemed "incompatible" with the enjoyment of the public parks - the poor and homeless.  It is no accident that all of the ordinances at issue here have been applied vigorously to the homeless community and those that reach out to them.  Each ordinance in this case presents a roadblock where anyone engaging in expressive activity runs the risk of attracting too large of a crowd and violating the permit ordinance, or irritating a cop and risking a Trespass order.  The cumulative effect of these ordinances creates an atmosphere that is indifferent to the First Amendment at best, and overtly hostile in the case of the above Plaintiffs.

Plaintiffs respectfully ask this Court to find these park use ordinances unconstitutional, and to award whatever other relief this Court sees fit.

Dated this 11th day of April, 2007.

Respectfully submitted by:

/s/                                                                          /s/
_____          _____
Allen Lichtenstein                                          Lee Rowland
General Counsel,                                           Staff Attorney, ACLU of Nevada
ACLU of Nevada NV                                     NV Bar No. 10209
Bar No. 3992                                                 732 South Sixth Street, Suite 200A
3315 Russell Road, No. 222                          Las Vegas, NV 89101
Las Vegas, Nevada 89120                             702-366-1902 -phone
702-433-2666 - phone                                   702-366-1331-fax
702-433-9591 - fax                                         rowland@aclunv.org
alichtensteinlaw@aol.com

Attorneys for Plaintiffs

1

2

3                                  **CERTIFICATE OF SERVICE**

4          On April 11, 2007, I placed in First Class, U.S. Mail, postage prepaid, copies of the Plaintiffs'

5   Motion for Summary Judgment, addressed to:

6   Philip R. Byrnes
    Deputy City Attorney
7   Las Vegas City Hall
    400 Stewart Avenue, 9th Floor
8   Las Vegas, NV 89101

9   and

10  Thomas D Dillard
    Rawlings, Olson, Cannon, Gormley & Desruisseaux
11  9950 West Cheyenne Avenue
    Las Vegas, NV 89129

12
                                        /s/ Allen Lichtenstein
13                               _____

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**LIST  OF EXHIBITS**

2

3    Exhibit 1                "Citations," 2 pages

4    Exhibit 2                "Transcript of Hearing Before Judge Assad," 5 pages

5    Exhibit 3                "Relevant Ordinances", 3 pages

6
     Exhibit 4                "Marshals Trespass Policy," 4 pages
7
     Exhibit 5                "Park Reservation Guidelines," 5 pages
8
9    Exhibit 6                "Third Declaration of Gail Sacco," 4 pages

10   Exhibit 7                "First Declaration of Gail Sacco," 4 pages

11   Exhibit 8                "Children's-Only Parks Legislative History," 4 pages

12   Exhibit 9                "Erin Neff, 'Controversy Surrounds Ordinance Boosting Kids' Use of Neighborhood's
13                            Parks," 3 pages

14   Exhibit 10               "Trespass Logs," 4 pages

15   Exhibit 11               "Email from Ben Little," 1 page

16
     Exhibit 12               "Transcript of Oral Argument," 60 pages
17

18

19

20

21

22

23

24

25

26

27

28