# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| GAIL SACCO, et al., ) | |
| ) | 2:06-CV-0714-RCJ-LRL |
| Plaintiffs, ) | 2:06-CV-0941-RCJ-LRL |
| ) | |
| vs. ) | |
| ) | **ORDER** |
| CITY OF LAS VEGAS, et al., ) | |
| ) | |
| Defendants. ) | |

This matter comes before the Court on Plaintiffs' Motion for Summary Judgment (#51) and Defendants' Counter-Motion for Summary Judgment (#58). Plaintiffs contest the constitutionality of Las Vegas City ordinances regulating public park use. The Court has considered the motions, the pleadings on file, and oral argument on behalf of all parties. Pursuant to the following analysis, Plaintiffs' Motion for Summary Judgment (#51) is denied, and Defendants' Counter-Motion for Summary Judgment is granted.

## BACKGROUND

On June 12, 2006, Plaintiffs, comprised of various political and religious activists, filed a Complaint challenging the constitutionality of the City of Las Vegas's ("City") group event permitting system, designation of three parks for children's only use, and trespass policy. (#1 to 2:06-CV-0714) ("714 case"). On August 2, 2006, the same Plaintiffs filed another Complaint seeking to overturn the City's ordinance banning the feeding of the indigent in City parks. (#1 to 2:06-CV-0941) ("941 case"). The 941 case was consolidated with the 714 case on October 27, 2006.

On January 26, 2007, the Court entered a preliminary injunction declaring Las Vegas Municipal Code 13.36.055, which outlawed feeding the indigent in city parks, unconstitutional for vagueness. (#49.) Plaintiffs now ask the Court to: (1) enter a permanent injunction against LVMC 13.36.055; (2) declare the City's permitting system for group use of City parks unconstitutional under the First Amendment; (3) declare the City's establishment of three Children's Parks unconstitutional under the Equal Protection Clause of the Fourteenth Amendment; and (4) declare the City's trespassing policy unconstitutional under the Due Process Clause.

The City of Las Vegas has sixty-seven operating parks. These parks range from large regional parks to small neighborhood parks. Some parks are dedicated to specific uses such as softball fields, water activities, skating, children's play, and dog recreation.

Under the Las Vegas Municipal Code, park events involving more than twenty-five persons require a permit. The City has set aside fifteen parks for possible group use. LVMC 13.36.080 governs the issuance of permits for group use:

> Any person who desires to use any park or recreational facility of the City for a group of twenty-five individuals or more, or any person who desires to conduct some event in which it could reasonably be assumed that twenty-five or more persons might gather at a park or recreational facility of the City to participate in or witness such event, shall first apply and obtain a permit from the Director.

The ordinance does not apply to "any event which is sponsored by the Department. *Id.* The City may deny a group permit to: (1) protect the use and enjoyment of the park for other members of the public; (2) protect the health and safety of park visitors; (3) ensure adequate parking and sanity facilities to accommodate park users; (4) protect park grounds from damage or overuse; (5) ensure the park and surrounding area are kept clean; and (6) make sure that group use does not disturb or annoy neighbors of the park. LVMC 13.36.090. The majority of permits are for social events such as company picnics and family parties. Some permits have been issued for

expressive events, but the City maintains it has never received an application for a permit for the express purpose of feeding the homeless. The City does not make any content-based review of applications. Applications are rarely denied; most denials result from the existence of a prior permit for the same facility.

The City also has a permitting scheme for "special events," which Plaintiffs also challenge. Although LVMC 13.36.132 defines special events as events involving twenty-five or more persons, the Department of Leisure has administratively defined a special event as one involving more than 400 people, requiring an admission charge, or involving the use of stages or bartering. Applications for group or special event use must be submitted fourteen days prior to the planned event and require a $50 minimal fee. An applicant who is denied a group use or special event permit may appeal to the Las Vegas City Council under LVMC 13.36.100. Plaintiffs contend that these permitting ordinances violate their First Amendment rights by restricting their access to a public forum.

On July 12, 1999, the City set aside three parks for the use of small children, James Gay Park, Ethel Pearson Park, and the Fitzgerald Tot Lot. This resolution was passed pursuant to findings that these parks were being overrun by alcohol and drug use, sexual activity, sleeping, and other activities inconsistent with children's use and enjoyment. (*See* Ex. 8 to #54.) LVMC 13.36.070 provides that: "[N]o person over the age of twelve years, other than a parent, guardian or other responsible person accompanying a child of the age of twelve years or younger, shall visit, frequent, be present in or loiter around any park which is designated . . . as a children's park." Plaintiffs also seek to overturn this ordinance as violative of their First Amendment and Equal Protection rights.

The Las Vegas Metropolitan Police Department and Las Vegas Deputy Marshals employ a Trespass system where officers may give trespass citations to individuals if they commit crimes on City property. These citations are often referred to as an "86" warning, or being "86'ed." Individual Plaintiffs have been cited for violating LVMC 13.36.055 (feeding the homeless), and 13.36.080 (group use without a permit); and have been banned for six months from Circle Park for violating 13.36.080. Plaintiffs also claim they have been constructively shut out from the three Children's only parks. They claim that these park regulations and policies have violated their First Amendment, Due Process, and Equal Protection rights.

**STANDARD OF REVIEW**

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is proper if the evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). As summary judgment allows a court to dispose of factually unsupported claims, the court construes the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazari*, 84 F.3d 1194, 1197 (9th Cir. 1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, the party opposing the motion may not rest on the mere allegations or denials of its pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).  When the nonmoving party bears the burden of a claim or defense at trial, the moving party can meet its initial burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case.  *Celotex*, 477 U.S. at 325. Conversely, when the moving party bears the burden of proof at trial, then it must establish each element of its case at summary judgment.

## DISCUSSION

### I. Permanent Injunction Against LVMC 13.36.055

Plaintiffs first ask the Court to reaffirm that LVMC 13.36.055 is unconstitutional and enter a permanent injunction enjoining its enforcement.  LVMC 13.36.055 bars the feeding of the indigent in city parks.  On January 26, 2007, the Court entered a preliminary injunction declaring the ordinance void for vagueness. (#49.)  Additionally, the Court retained jurisdiction for adjudication of any amended ordinance and provided the City with instructions on how to revise the ordinance to cure its constitutional defects.  The City has not modified the ordinance and stated at oral argument that it had no intention of doing so.  On the assumption that this Order represents a final adjudication of the case, the Court enters a permanent injunction against enforcement of LVMC 13.36.055.  However, if Plaintiffs later challenge a revised version of the homeless feeding ordinance, this Court retains jurisdiction to evaluate the validity of such ordinance.

### II. Group Use and Special Event Permitting Ordinances

Plaintiffs contend that the City group use and special event permitting ordinances violate the Free Speech Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the vagueness protections contained within the Due Process Clause of the Fifth and Fourteenth Amendments.  They seek to void the ordinances in both facial and as-applied challenges.  Each of their constitutional arguments fail.

### A. First Amendment Challenge

Plaintiffs' principal argument is that the group permitting ordinances violate protected First Amendment speech, both facially and as applied. Previous cases analyzing permit restrictions in public parks have applied the time, place, and manner test under the First Amendment and held that the laws must be: (1) content-neutral; (2) narrowly tailored to serve a significant government interest; and (3) leave open ample alternate channels of expression. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Under controlling case law, Plaintiffs' facial and as-applied challenges both fail.

#### 1. Facial Challenge

The Supreme Court recently considered a facial challenge to an almost identical Chicago ordinance requiring permits for group events in city parks and upheld the ordinance in response to the same arguments the Plaintiffs now advance. In *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), the Court examined an ordinance that required a permit in order to "conduct a public assembly, parade, picnic, or other event involving fifty individuals." The ordinance also provided similar grounds for denial as found in the present Las Vegas ordinance. *Id.* at 319. The Court rejected the protestors' challenge to the regulation, including their argument that heightened scrutiny applied, stating:

> We reject those contentions. *Freedman* is inapposite because the licensing scheme at issue here is not a subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum. The Park District's ordinance does not authorize a licensor to pass judgment on the content of speech: None of the grounds for denying a permit has anything to do with what a speaker might say. Indeed, the ordinance (unlike the classic censorship scheme) is not even directed to communicative activity as such, but rather to *all* activity conducted in a public park. The picnicker and soccer player, no less than the political activist or parade marshal, must apply for a permit if the 50-person limit is to be exceeded. And the object of the permit system (as plainly indicated by the permissible grounds for permit denial) is not to exclude communication of a particular content, but to coordinate multiple uses of limited space, to assure preservation of park facilities, and to prevent uses that are dangerous, unlawful,

> or impermissible under the Park District's rules, and to assure financial accountability for damage caused by the event. As the Court of Appeals well put it: "[T]o allow unregulated access to all comers could easily reduce rather than enlarge the park's utility as a forum for speech." 227 F.3d at 924. . . .
>
> We have never required that a content-neutral permit scheme regulating speech in a public forum adhere to the procedural requirements set forth in *Freedman*. FN2. "A licensing standard which gives an official authority to censor the content of a speech differs toto coelo from one limited by its terms, or by nondiscriminatory practice, to considerations of public safety and the like." . . .
>
> Regulations of the use of a public forum that ensure the safety and convenience of the people are not "inconsistent with civil liberties but . . . [are] one of the means of safeguarding the good order upon which [civil liberties] ultimately depend." *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941). Such a traditional exercise of authority does not raise the censorship concerns that prompted us to impose the extraordinary procedural safeguards on the film licensing process in *Freedman*.

*Id.* at 322-23. Here, the City's group permitting ordinance is materially the same as the *Thomas* ordinance. It is directed at all large groups, independent of expressive purpose, and is appropriately tailored to encourage safety without violating speech rights. All parties, regardless of viewpoint, are treated alike under the permitting requirements.

The *Thomas* Court went on to discuss the need to curb discretion in the enforcement of permitting ordinances, ultimately finding the Chicago law constitutionally valid:

> Of course even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression. Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content. See *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992). We have thus required that a time, place, and manner regulation contain adequate standards to guide the official's decision and render it subject to effective judicial review. . . .
>
> As we have described, the Park District may deny a permit only for one or more of the reasons set forth in the ordinance. See n. 1, *supra*. It may deny, for example, when the application is incomplete or contains a material falsehood or misrepresentation; when the applicant has damaged Park District property on prior occasions and has not paid for the damage; when a permit has been granted to an earlier applicant for the same time and place; when the intended use would

    present an unreasonable danger to the health or safety of park users or Park District employees; or when the applicant has violated the terms of a prior permit. See Chicago Park Dist.Code, ch. VII, § C.5.e. Moreover, the Park District must process applications within 28 days, § C.5.c, and must clearly explain its reasons for any denial, § C.5.e. These grounds are reasonably specific and objective, and do not leave the decision "to the whim of the administrator." *Forsyth County*, 505 U.S. at 133, 112 S.Ct. at 2395. They provide "'narrowly drawn, reasonable and definite standards'" to guide the licensor's determination . . . .

*Id.* at 323-24. The City's ordinance in this case similarly restricts the discretion of the Department of Leisure Services. Under LVMC 13.36.090, the City may only deny a permit for the reasons specified in the ordinance. These reasons are content-neutral and are substantively similar to the reasons listed in the valid Chicago ordinance.

    As LVMC 13.36.080 is factually similar to the ordinance upheld in *Thomas*, Plaintiffs' facial challenge must fail as a matter of law. The City group permitting scheme is completely content-neutral, requires permits for group use of twenty-five or more persons, requires decision on an application within 14 days, and provides the City with a list of valid reasons for denial. There are thus no material differences between the Las Vegas ordinance and the Chicago law upheld in *Thomas*.

    **2.    As Applied Challenge**

    Plaintiffs also seek to overturn the ordinance in an as-applied challenge. In an as-applied challenge, Plaintiffs have the burden of showing discriminatory intent, and they have not done so here. In *Thomas*, the Court stated: "Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional, but we think that this abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements." *Id.* at 325. The Plaintiffs have here failed to meet their burden in proving discriminatory intent in the

ordinance's enforcement. There is no record demonstrating any pattern, or even specific instances, of the City favoring certain kinds of speakers over others. Plaintiffs rely on statements made by the City's attorney during the preliminary injunction hearing as evidence of bias, but these statements are insufficient to justify a finding that the ordinances are applied in a discriminatory manner on a City wide basis. Furthermore, Plaintiffs rely solely on evidence relating to the now closed Huntridge Circle Park, and have not established a broader pattern of discrimination as to the City park system as a whole. Without evidence of discrimination, Plaintiffs' as-applied challenge must be rejected.

### 3. Limiting Group Use to Fifteen Parks

Plaintiffs contend that even if *Thomas* holds that park permitting schemes are not per se unconstitutional, the City's ordinances in this case are defective because the City has only made available fifteen of sixty-seven operating parks for group use. The City asserts that it limits group use to a geographically diverse set of larger parks that have sufficient amenities, parking, restrooms, tables, shelters, and so forth to accommodate group use. As noted previously, the applicable standard for such regulations is time, place, and manner analysis.

In this case, the limitation to fifteen parks is clearly content neutral. *See Nat'l Council of Arab Americans v. City of New York*, 331 F. Supp. 2d 258, 267-68 (S.D. N.Y. 2004). The limitation is also narrowly tailored to serve a substantial City interest of "managing and maintaining park facilities." *Id.* at 268. Regarding the narrow tailoring prong, the Ninth Circuit has instructed:

> A narrowly-tailored permitting regulation need not be the least restrictive means of furthering a locality's asserted interests. . . . "The Requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation'" (internal citations omitted). As we have noted, local governments

can exercise their substantial interest in regulation competing uses of traditional public fora by imposing permitting requirements for certain uses.

*Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1038 (9th Cir. 2006). Here, the City's limitation on group use to larger parks promotes its interest in balancing competing group and general use of parks and protects the public use of park facilities, including group and individual use for purposes of speech or expressive conduct. With fifteen parks available for group use, those parties wishing to advance particular viewpoints through group demonstrations have ample alternative channels of communication available to them. The Plaintiffs provide no record to the contrary. Therefore, the City has not violated the First Amendment in limiting group use to fifteen parks.

### B.     Equal Protection Challenge

Plaintiffs contend the City's group event ordinance violates the Equal Protection Clause because it contains an explicit exemption for the Permit Code for any group use "sponsored by the Department." LVMC 13.36.080. Regulatory classifications that are based on suspect classes or implicate fundamental rights are evaluated under a heightened standard. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Otherwise, the rational basis test applies and the law need only be rationally related to a legitimate government interest. In this case, Plaintiffs argue that this exemption triggers strict scrutiny because it implicates First Amendment rights by disfavoring those groups seeking to use the parks for expressive purposes (such as protestors) and favoring those sponsored by the City. If a City ordinance draws classifications that restrict First Amendment rights, strict scrutiny applies and the law must be "finely tailored to serve substantial [government] interests." *ACLU of Nevada v. City of Las Vegas*, 466 F.3d 784, 797 (9th Cir. 2006).

In this case, the group use ordinances do not facially impinge on First Amendment rights or draw classifications that burden free speech. The group use ordinances seek to aid the city in managing competing park uses, and do not distinguish between expressive and non-expressive group use of parks. The City exemption also does not favor certain kinds of speech; the "Department" exemption would presumably apply to both expressive or speech group meetings as well as purely recreational conclaves. Therefore, the ordinances do not burden fundamental rights and rational basis applies. The City has a legitimate interest in coordinating requests for group park use. It also would be impractical for the City to apply to itself for a group use permit – the City is aware of park scheduling and capabilities. The Ninth Circuit has declined to hold similar city ordinances facially unconstitutional that do not regulate expressive activity on their face. *See id.* at 800.

Plaintiffs counter that as applied to them, the group use ordinance burdens their First Amendment rights because they seek to use the park for protesting and other expressive purposes. Plaintiffs seek support in a recent Ninth Circuit decision declaring a Las Vegas anti-tabling ordinance on Fremont Street violative of Equal Protection. In *ACLU of Nevada*, an anti-tabling ordinance contained an exemption for labor-related speech. The court reasoned that the law triggered the First Amendment as applied to Plaintiffs, triggering heightened scrutiny, because Plaintiffs sought to use tables to facilitate dissemination of literature at Fremont Street. It then concluded that the labor-related speech exemption violated the Equal Protection Clause because the law facially gave preferential treatment to the expression of views on one particular subject. *Id.* at 800. In reaching this conclusion, the court drew on two prior Supreme Court decisions where the Court struck down labor exemptions in anti-picketing statutes. *See Police Dep't v. Mosley*, 408 U.S. 92 (1972); *Carey v. Brown*, 447 U.S. 455 (1980).

This case is distinguishable from both *ACLU of Nevada* and the two related Supreme Court decisions. In all of these decisions, the courts struck down city ordinances that contained exemptions expressly favoring one particular type of speech. In this case, LVMC 13.36.080's exemption for Department activities is completely content-neutral. Furthermore, it would be nonsensical for the City to apply to itself for a group event permit. The City presumably knows of its intended use of park facilities, of competing time conflicts with such use, and whether the desired event would otherwise be inappropriate. Therefore, the Department use exemption is reasonable and Plaintiff's Equal Protection Challenge fails.

### C. Vagueness Challenge

Plaintiffs also contend the group use ordinances are unconstitutionally vague. A statute may be impermissibly vague in two ways: (1) "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits"; and (2) if it "encourages arbitrary and discriminatory enforcement." *Chicago v. Morales*, 527 U.S. 41, 56-57 (1999). The relevant ordinance here states that a group permit is required for any event where the organizer could reasonably assume that "twenty-five or more persons might gather at a park . . . to participate in or witness such event." LVMC 13.36.080. Plaintiffs argue that by calculating the group size both in terms of anticipated participants and possible "witnesses" present, the ordinance fails to provide notice of what conduct is prohibited and invites arbitrary enforcement. Plaintiffs note that when cited for violating this ordinance, they visited Circle Park in a group of two or three individuals to minister to homeless individuals already present, and had no ability to predict how large a group would actually gather. They also assert that by including "witnesses" in the group calculation, the ordinance lends itself to punishing protected

expressive activities, such as group protests, as these activities are more likely to attract the attention of the general public.

Plaintiffs' arguments are unavailing. A person of ordinary intelligence should be able to estimate the size of a planned event and determine if a permit is likely to be necessary. It is true that certain events are more likely to attract an audience – or "witnesses" – than others. For example, events ranging from an organized softball game to a controversial political speech are more likely to attract outside attention than a private barbeque. But, a group organizer is capable of reasonably anticipating the amount of attention a planned event might attract. Including an anticipated audience in the calculated group size advances the ordinance's legitimate purposes of restricting large scale gatherings to parks that can accommodate such use and otherwise managing park resources. If an event is likely to attract sufficient attention to bring the total gathering in excess of twenty-five persons, then the City has a substantial interest in requiring a group event permit. Otherwise, small parks with insufficient facilities could be taxed with large gatherings or otherwise suitable parks could be faced with multiple, unexpected group events. As the City notes, if an event holder is unsure as to size of a planned event, they are free to err on the side of caution and apply for a permit. Therefore, the use of the term "witness" is not unduly vague and the group use ordinance survives the vagueness challenge.

### D. Standing to Challenge Special Events Ordinance

Plaintiffs challenge the City's special events ordinances on the same grounds they challenge the group use ordinances. LVMC 13.36.132 requires a permit for any special event in which twenty-five or more persons might reasonably attend. Organizers of special events must acquire a general liability insurance policy and pay for any additional costs incurred by the City as a result of the event. While the municipal code defines a special event as an activity with

more than twenty-five persons, the Department of Leisure Services has administratively defined special events as: (1) any event with 400 or more people; or (2) any event with less than 400 people that also involves charging admission, requiring use of a stage or power, or has bartering. (Ex. A to #54.) The Ninth Circuit has held that in considering a facial challenge to an ordinance, it is appropriate to consider a "city's authoritative interpretation of its guidelines and ordinances." *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1035 (9th Cir. 2006); *see also Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992) ("In evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it.") Plaintiffs admit that they have never been denied a special event permit, have never been cited under the special event ordinances, and have no plans to hold a park event of more than 400 persons. As standing requires some showing of "injury in fact," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, Plaintiffs lack standing to challenge the special events ordinance.

### III.   Children's Only Ordinances

On July 12, 1999, the City set aside three parks for the use of small children, James Gay Park, Ethel Pearson Park, and the Fitzgerald Tot Lot. This resolution was passed pursuant to findings that these parks were being overrun by alcohol and drug use, sexual activity, sleeping, and other activities inconsistent with children's use and enjoyment. (*See* Ex. 8 to #54.) LVMC 13.36.070 provides that: "[N]o person over the age of twelve years, other than a parent, guardian or other responsible person accompanying a child of the age of twelve years or younger, shall visit, frequent, be present in or loiter around any park which is designated . . . as a children's park." Plaintiffs seek to overturn this ordinance as violative of the First Amendment and Equal Protection Clause.

**A.     First Amendment Challenge**

Plaintiffs contend that in restricting adult access to these three parks, the City has excluded them from a public forum and limited their possible venues for free speech. As a restriction on access to a public forum, the Children's Park ordinance is subject to time, place, and manner analysis. As such, the regulation must be content neutral, narrowly tailored to serve a significant government interest, and leave open ample alternate channels of expression. The ordinance here is clearly content neutral, as it is not directed in any manner at expressive activity. The ordinance also clearly leaves open ample alternate forums of expression. Only three of sixty-seven City parks were designated as Children-only under the ordinance. These three parks are geographically spread throughout the City. Therefore, there are more than sufficient alternate forums for individuals seeking parks for public expression. The key issue is thus whether the ordinance is narrowly tailored to a significant government interest.

In this case, the City has a significant government interest in protecting children and providing public parks for their safe enjoyment. In numerous other contexts, courts have held that the protection of children from criminal, dangerous, or highly controversial activity is a significant government interest. In *Sable Comm's of California, Inc. v. FCC*, 492 U.S. 115, 126, the Supreme Court stated as a general rule that "there is a compelling interest in protecting the physical and psychological well-being of minors." In that case, the Court applied the rule in holding that the State could prohibit obscene telephone messages from reaching children if the prohibition was narrowly drawn. *Id.* Zoning ordinances regulating the location of adult theaters near schools have consistently been upheld to protect children. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 1986); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 62-63 (1976). Similarly, in *Olmer v. City of Lincoln*, 23 F. Supp. 2d 1091, 1100 (D. Neb. 1998), the

court considered a constitutional challenge to an ordinance prohibiting anti-abortion protests near churches and concluded "that the city's interest in protecting very young children from frightening images is constitutionally important; that is, the interest is 'significant,' 'compelling,' and 'legitimate.'"  Therefore, a government's authority to pass restrictive laws to protect the well being of children is established in the case law.

It is true that in a few of these cases, the courts found a significant government interest in protecting children, but overturned the underlying ordinance because it was not narrowly tailored.  *See, e.g., Sable Comm's of California*, 492 U.S. at 126-131; *Olmer*, 23 F. Supp. 2d. at 1100-1101.  Therefore, even if the City has a clear significant interest in protecting children at City parks, the restrictive ordinance must also be narrowly tailored.  The test for whether a law is narrowly tailored is whether the "regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *United States v. Albertini*, 472 U.S. 675, 689 (1985).  "So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward v. Rock Against Racism*, 491 U.S. 781, 799-800 (1989).  In this case, LVMC 13.36.080 only sets aside three parks for Children's use, leaving open more than sixty others for general use.  This regulation achieves the City's interest of providing a bare minimum of parks that are likely to be entirely safe for children and is not substantially broader than necessary.  Therefore, the regulation is narrowly tailored and is a valid time, place, and manner restriction.

### B. Equal Protection Challenge

Plaintiffs also allege that the Children's ordinance offends the Equal Protection Clause because it discriminates against "childless adults." Plaintiffs note that in enjoining the homeless ordinance, the Court held that there was no rational basis between feeding a single indigent person and the heightened park crime the City sought to alleviate. They analogize that there is similarly no rational relation between childless adults and the crime documented at the three Children's parks.

Plaintiff's Equal Protection challenge must fail. However the relevant class is characterized, the rational basis test applies. Classes of childless adults, or persons over twelve years old, or adults unassociated with children, have never received heightened scrutiny under the Fourteenth Amendment. That said, the relevant distinction here is between children and adults, not childless adults and parents. A childless babysitter may attend a park with a child, while a parent is excluded if unaccompanied. Therefore, under rational basis standards, the Plaintiffs have the burden of proving there is no rational relationship between the favored class of children and the City's interest in providing a safe environment for children's park enjoyment. In this case, the City has submitted findings showing these parks were being overrun by alcohol and drug use, sexual activity, sleeping, and other activities inconsistent with children's use and enjoyment. (*See* Ex. 8 to #54.) Contrary to the Plaintiffs' contention, there is a rational relationship between addressing these ills and restricting these three parks for children's only use. Young children are simply less likely than adults or teenagers to commit crimes, and are more likely to be victimized by such crimes. The City has only designated three of the City's sixty-seven parks for Children-only use, leaving open ample alternative public fora for adult use.

Therefore, the Plaintiffs have not met their burden under the rational basis test and their Equal Protection challenge fails.

**IV.     Trespass Policy**

Finally, Plaintiffs challenge the City's policy of trespassing, or "86'ing," individuals who commit crimes on public property from returning to that property for a specified period of time. NRS 207.200 forbids trespass on public property. Under the City's trespassing system, City Marshals may issue trespass warnings to individuals who commit crimes on City property. The City's trespass system is found in the City Marshal's Field Interviews policy. Under "Trespass Procedures," the policy states that marshals "May Trespass Subjects from city property for criminal violations." (Ex. 4 to #51 at 8.) If a person is trespassed, a Marshal is to fill out a field interview card and note the citation in the trespass log. *Id.* The City then uses that information to track the entry of trespassed individuals onto public lands. Under this policy, several Plaintiffs have been trespassed from various parks for six months for violating the homeless ordinance. Plaintiffs contend the trespassing policy violates procedural due process and is impermissibly vague.

In *Virginia v. Hicks*, 539 U.S. 113 (2003), the Supreme Court reviewed a trespass regulation at a low income housing project and stated:

> As for the written provision authorizing the police to arrest those who return to Whitcomb Court after receiving a barment notice: That certainly does not violate the First Amendment as applied to persons whose postnotice entry is not for the purpose of engaging in constitutionally protected speech. And Hicks has not even established that it would violate the First Amendment as applied to persons whose postnotice entry *is* for that purpose. Even assuming the streets of Whitcomb Court are a public forum, the notice-barment rule subjects to arrest those who reenter after trespassing and after being warned not to return-*regardless* of whether, upon their return, they seek to engage in speech. Neither the basis for the barment sanction (the prior trespass) nor its purpose (preventing future trespasses) has anything to do with the First Amendment. Punishing its

violation by a person who wishes to engage in free speech no more implicates the First Amendment than would the punishment of a person who has (pursuant to lawful regulation) been banned from a public park after vandalizing it, and who ignores the ban in order to take part in a political demonstration. Here, as there, it is Hicks' nonexpressive *conduct*–his entry in violation of the notice-barment rule-not his speech, for which he is punished as a trespasser.

*Id.* at 123. Under *Hicks*, City Marshals may constitutionally issue trespass warnings to individuals who commit crimes on City property.

Plaintiffs argue that the trespass logs maintained by the Marshals indicate warnings have been issued for non-criminal offenses. The record clearly reveals that each of these notations identify criminal offenses. Entering property after receipt of a trespass warning is a violation of NRS 207.200. Furthermore, every notation for sleeping or misuse cited by Plaintiffs occurred at the Downtown Transportation Center, which has specific regulations governing conduct. For example, sleeping and misuse of property are prohibited at the Transportation Center under LVMC 10.84.030 and 10.84.060.

Under *Hicks*, the City's trespass system is constitutionally secure. Plaintiffs fail to bring any evidence that the City has used the policy to abuse their constitutional rights. Therefore, the Court upholds the City trespass policy.

### CONCLUSION

Therefore, pursuant to the prior analysis, IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment (#51) is *denied*, and Defendants' Counter-Motion for Summary Judgment is *granted*.

DATED:   August 20, 2007.

_____
ROBERT C. JONES
UNITED STATES DISTRICT JUDGE